# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | | |
|---|---|---|---|
| TRACY R. NEWELL, | : | | |
| | : | | |
| Plaintiff, | : | Civil Action No.: | 17-2695 (RC) |
| | : | | |
| v. | : | Re Document No.: | 16 |
| | : | | |
| STEVEN T. MNUCHIN, SECRETARY OF | : | | |
| U.S. DEPARTMENT OF TREASURY | : | | |
| | : | | |
| Defendant. | : | | |

## MEMORANDUM OPINION

### GRANTING DEFENDANT'S MOTION FOR SUMMARY JUDGMENT

## I. INTRODUCTION

On December 12, 2017, U.S Department of the Treasury employee Tracy Newell brought

this employment discrimination action pursuant to Title VII of the Civil Rights Act of 1964, 42

U.S.C. § 2000e, *et seq*., as amended ("Title VII"). Ms. Newell alleges that she was discriminated

against on account of race (African American) and sex (female), retaliated against due to her

prior Equal Employment Opportunity ("EEO") activity, and subjected to a hostile work

environment by the sexual harassment of her white, male coworkers.[1] More specifically, Ms.

Newell contends that she was subjected to "different and disparate conditions" due to her race

and gender/sex, and that, when "she complained [about] her disparate treatment, Defendant

retaliated by demoting her" in 2014. Compl. 1; *see also id.* ¶ 9. She further avers that "this

retaliation continued" when her employer "denied [her] a bonus, denied the opportunity to take a

---

[1] Plaintiff's original complaint also included age discrimination claims pursuant to the
Age Discrimination in Employment Act of 1967 ("ADEA"). *See* Compl. 1, ECF No. 1. Because
Plaintiff has agreed to withdraw her ADEA claim, *see* Pl.'s Opp'n to Def.'s Mot. Summ. J.
("Pl.'s Opp'n") ¶ 11 n.1, the Court does not address this aspect of Plaintiff's complaint.

leadership development training class," and "promot[ed] at least two less qualified co-workers who did not have to compete for the supervisory position [that Ms.] Newell had applied for." *Id.* at 1. Defendant moved for summary judgment on all claims, arguing, first, that Ms. Newell failed to timely and properly exhaust her administrative remedies for her claims of retaliation and non-selection for a supervisory position; second, that Defendant has put forth a legitimate, non-discriminatory reason for her 2014 reassignment; and finally, that the alleged incidents do not constitute an actionable hostile work environment claim. *See* Def.'s Mem. Supporting Def.'s Mot. Summ. J. ("Def.'s Mem.") 1–4. For the reasons set forth below, the Court grants Defendant's motion for summary judgment on all claims.[2]

## II. BACKGROUND

### A. Factual History[3]

Ms. Newell's claims involve several categories of activity occurring between 2012 and 2017. The Court will summarize each of these categories in turn, beginning with the events surrounding Plaintiff's removal from a Temporary Plate Printer Assistant Supervisor position in March 2014; then describing the events that give rise to Plaintiff's harassment and hostile work

---

[2] Although the Court considers all materials before it in deciding Defendant's motion, it notes that Defendant's reply brief—which runs to thirty-six pages—does not comply with the local rules. *See* LCvR7(e) ("A memorandum of points and authorities in support of or in opposition to a motion shall not exceed 45 pages and a reply memorandum shall not exceed 25 pages, without prior approval of the Court.").

[3] On a motion for summary judgment, the Court accepts the non-movant's evidence—here, Plaintiff—as true. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." (citing *Adickes v. S.H. Kress & Co.*, 398 U.S. 144, 158–59 (1970)). Unless otherwise indicated, this reporting of the facts draws from material facts that Plaintiff has indicated are not in dispute. *See generally* Pl.'s Statement of Material Facts.

environment claims; and then concluding with the events surrounding Plaintiff's 2017 non-selection claim and subsequent claims of discrimination and retaliation.

### 1. 2014 Reassignment

Ms. Newell began working in the U.S. Treasury Department's Bureau of Engraving and Printing ("BEP") in 1987 and has held several positions in the BEP since that time. *See* Pl.'s Statement of Material Facts ("SMF") 2, ECF No. 19-1.[4] In 2004, she became a Plate Printer, a position in which she worked on the day shift and was directly supervised by Bob Smith. *Id*. at 3. In 2012, Ms. Newell applied for a Temporary Plate Printer Assistant Supervisor ("Temporary Assistant Supervisor") position. *Id*. at 3. This position was advertised with the statement that it was a "temporary promotion not-to-exceed ['NTE'] 1 year," *id*.; *see also* Pl.'s Opp'n Ex. 13, Vacancy Announcement No. 2012-085M, ECF No. 19-15, which "may be made permanent without further competition," Pl.'s Opp'n Ex. 13 at 1. With this temporary promotion, Ms. Newell switched to the evening shift and was directly supervised by Denita Simmons, with Mr. Smith now acting as her second-line supervisor. Pl.'s SMF 4.

This one-year NTE temporary promotion was set to end on September 22, 2013. *Id*. at 5. However, Ms. Newell continued in this position until March 2014, *id*., when she was reassigned to her former Plate Printer position, effective March 31, 2014, *id*. at 7–8. The core facts concerning both Ms. Newell's time in this position between September 2013 and March 2014 and her March 2014 reassignment are disputed. Ms. Newell asserts that her position was made permanent after a one-year probationary period, in keeping with past BEP practices, such that her reassignment was a "demotion." *Id*. at 7.

---

[4] Because every page of this filing is labelled as page 33, the Court refers to the ECF page numbers for this document.

Defendant asserts that there was no such permanent assignment and demotion, but rather a reassignment to her prior position once the temporary term ended. On this version of events, which Plaintiff contests, *see generally* Pl.'s SMF 3–9, Ms. Newell's managers extended her initial temporary assignment for six months (from September 23, 2013 to March 23, 2014) upon the approval of Patrick W. Zunker in the agency's human resources ("HR") department, *id*. at 5. According to Defendant, Ms. Newell's supervisors attempted to further extend her temporary promotion in March 2014, but were informed by a new HR representative, Patricia Mendoza, that the prior extension of both Ms. Newell and another employee appointed to the same temporary vacancy at the same time, Richard Gibel, had been in error. *Id*. at 5–7. Because, on Ms. Mendoza's read, the governing provisions in 5 C.F.R. 335 prohibited an extension of these NTE positions beyond the advertised term (here, one year), *id*. at 7, Mr. Smith informed Plaintiff's direct supervisor, Ms. Simmons, that Ms. Newell would not be continuing in her temporary promotion. *id*. at 33. Defendant states that, based on this information, Ms. Newell was returned to her non-supervisory Plate Printer position on March 31, 2014.[5] *Id*. at 7. Mr. Gibel was also returned to his previously held position, Acting Plate Printer Assistant Supervisor, in late March 2014. *Id*. at 8–9. Two other male employees, Mr. Smith and Donovan Elliott, were also reassigned at this time. *Id*. at 8. Defendant states that these two individuals were in temporary promotional assignments and denied extensions by Ms. Mendoza on the same

---

[5] The material in the record does not indicate explicitly whether Ms. Newell returned to the day shift (her placement before the temporary promotion) or the evening shift (her placement during her time as Temporary Assistant Supervisor). However, Plaintiff provides a chart with comparative data for the evening shift of the Plate Printing Division on which she is listed, *see* Pl.'s Opp'n Ex. 4, ECF No. 19-6, as well as a list of Plate Printing Division employees in which she is included among the evening shift printers, *see id*. at Ex. 28, ECF No. 19-30. The Court thus infers that the March 2014 Plate Printer reassignment was to the evening shift. *See Anderson*, 477 U.S. at 255 (citation omitted) ("The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in [her] favor.").

grounds as her denial of Ms. Newell's extension, *id*. at 8, whereupon Mr. Smith was returned to his position as Plate Printer Supervisor, effective April 6, 2014, *id*. at 9, and Mr. Elliott was returned to his position as Plate Printer Assistant Supervisor, effective April 25, 2014, *id*. at 9. Plaintiff disputes that these two individuals were in fact in temporary positions at the time of their reassignment. *See id*. at 8–9.

On May 2, 2014, Ms. Newell initiated contact with an Equal Employment Opportunity ("EEO") counselor. *See* Pl.'s Opp'n Ex. 33, EEO Counselor's Report 2, ECF No. 19-35. A formal EEO complaint was filed on June 2, 2014, *id*. at Ex. 34, ECF No. 19-36, and Ms. Newell's claim was accepted on June 13, 2014, *id*. at Ex. 38, EEO Acceptance Letter, ECF No. 19-40. The complaint accepted for investigation was "[w]hether Complainant was subjected to disparate treatment based on race (African-American), sex (female), and age (over 40) when she learned on March 31, 2014 that she was not made a permanent Plate Printer Assistant Supervisor and told to return to her former position as a Plate Printer." EEO Acceptance Letter 1. As the Court next describes, Ms. Newell subsequently amended this complaint to include harassment and hostile work environment claims.

2. Events Underlying 2014 Harassment and Hostile Work Environment Claims

The sexual harassment and hostile work environment components of Plaintiff's complaint arise from several incidents involving co-workers and one incident involving a direct supervisor that occurred during and soon after Ms. Newell's time working as a Temporary Assistant Supervisor. These events are clustered in early 2014. First, while Ms. Newell was operating in her temporary supervisory capacity, she alleges that a male co-worker asked her to go to a strip club and to sexually engage with another female employee. Def.'s Exhibits in Support of Def.'s Mot. Summ. J. ("Def.'s Exhibits") Ex. 19, Sept. 12, 2014 Declaration of Tracy R. Newell

("Second Newell Decl."), ECF No. 17-19; *see also* Pl.'s Opp'n Ex. 45, Email to Dennis

Wahkinney (documenting incident for EEO counselor), ECF No. 19-47. The individual in

question was later identified as Plate Printer Peter Steormann. Def.'s Exhibits Ex. 44, Pl.'s Resp.

Def.'s First Set of Interrogatories, ECF No. 17-44. In response, Ms. Newell states that she "told

him [she] did not engage in that activity" and that she "did not appreciate him saying anything in

that manner," Second Newell Decl. ¶¶ 48, 53, whereupon the male subordinate employee

"apologized and said he was only joking," *id*. ¶¶ 49, 54. There were no witnesses to this

interaction. *Id*. ¶ 52. However, Asa Soule, another Plate Printer, states that Peter Steormann also

asked her to go to a strip club with him. Pl.'s Opp'n Ex. 52, Declaration of Asa Soule 3, ECF

No. 19-54. Ms. Newell adds that it was "not unusual" for male employees to approach and

request "sexual favors under the guise of humor." Second Newell Decl. ¶ 55. She suggests that

such incidents were more frequent in February 2014, when she was also "referred to as 'Baby'

and 'Honey'" by another individual and "touched on the buttock" by a third male. Pl.'s Resp.

Def.'s First Set of Interrogatories ¶ 1. She also suggests that there was ongoing sexual behavior

in the workplace and states that she observed two unnamed superiors engaging in such conduct

on "several occasions" spanning "9 months in the year of 2013 and 2 months in the year 2014."

Second Newell Decl. ¶¶ 60–61. Ms. Simmons, Plaintiff's immediate supervisor, avers that Ms.

Newell never informed her of these incidents. Def.'s Exhibits Ex. 11, Declaration of Denita

Simmons ("Simmons Decl.") 12–13, ECF No. 17-11. Ms. Newell declined to escalate the

matter. *Id*. Mr. Smith also states that he was unaware of these incidents. Def.'s Exhibits Ex. 12,

March 14, 2019 Declaration of Robert E. Smith ("Third Smith Decl.") ¶ 44, ECF No. 17-12.

The next incident occurred on or about February 21, 2014,[6] when a male co-worker, Dennis Dunn, approached Ms. Newell at work. *Id.* ¶ 2.[7] There were no direct witnesses to this event. *See* Def.'s Exhibits Ex. 6, EEO Investigative File Bates No. 00020–00022, ECF No. 17-6. According to Ms. Newell, Mr. Dunn was "agitated about work related issues" and approached Ms. Newell, "became very aggressive," and then proceeded to refer to to Ms. Newell as an "idiot." Second Newell Decl. 9. Because she was "afraid of him," Ms. Newell did not speak with Mr. Dunn and instead reported the incident to her direct supervisor, Ms. Simmons. *Id.* at 10. Ms. Simmons in turn went to speak with Mr. Dunn, who was "extremely agitated," and "told him that he needed a cooling down period." Simmons Decl. 8.

The incident was then further escalated internally. Ms. Simmons raised the incident to Mr. Smith, her supervisor, as well as to the agency's Employee Labor-Management Relations Division ("EMLRD"). *Id.*; *see also* Def.'s Exhibits Ex. 12-C, Email Chain between Denita Simmons, Bob Smith, and ELMRD Representative, ECF No. 17-12. Mr. Smith and Ms. Simmons state that Mr. Dunn was disciplined for his behavior with a one-day suspension and assignment of a required anger management class. Third Smith Decl. ¶ 14. Ms. Newell maintains that Mr. Dunn was never required to serve his suspension. Pl.'s SMF 33 (citing Pl.'s Opp'n Ex. 27, Dunn Statement of Earnings and Leave, ECF No. 19-29).

---

[6] The EEO charge reports this event as occurring in 2013. Pl.'s Opp'n Ex. 41, EEO Amended Acceptance Letter, ECF No. 19-43. However, the emails that appear to address these events, the declarations of supervising officials, and the statement of material facts all date the event to 2014. Moreover, the agency's notice of decision proposing a suspension for Mr. Dunn's "improper conduct" was issued on March 27, 2014. Def.'s Exhibits Ex. 18, Memorandum for Dennis M. Dunn, ECF No. 17-18. Thus, the Court dates the incident to 2014.

[7] This deposition was filed along with an earlier deposition by Ms. Newell as part of a single exhibit. For clarity, the Court uses the ECF page numbers to refer to this document.

The next event on which Plaintiff bases her hostile work environment and harassment claims also involves Ms. Newell and Mr. Dunn. On March 27, 2014, both individuals as well Mr. Smith, Ms. Simmons, and Union Representative Josh Goad were present at a meeting to address the earlier incident between Ms. Newell and Mr. Dunn.[8] Ms. Newell alleges that Mr. Dunn accused her of having an affair with a co-worker during this meeting. Pl.'s SMF 10–11. Other individuals present at the meeting have different recollections of this event. Ms. Simmons recalls a comment about Plaintiff's relationship with a co-worker and Mr. Smith recalls "a vague remark about Plaintiff and a co-worker that Dunn had a separate issue with," which "did not come across to Smith as having a sexual connotation." *Id*. at 11. Neither Ms. Smith nor Ms. Simmons believed that the comment warranted any discipline or further action. *Id*.

In further support of these claims, Plaintiff points to a separate conflict on May 19, 2014, after her reassignment to Plate Printer. On this date, a co-worker, Charles Wheelock, raised his voice at Ms. Newell and "treated her in a hostile manner" following a dispute at the printing presses concerning an overtime schedule. Pl.'s SMF 13. A witness to the incident, employee Michael Nardozzi, characterized Mr. Wheelock as "loud and boisterous." *Id*. (citing Def.'s Exs. Ex 20, Supervisors' Email Chain Regarding Wheelock Incident 2, ECF No. 17-20). Ms. Newell

---

[8] As with the underlying incident, the EEO charge reports this event as occurring in 2013. EEO Amended Acceptance Letter. So, too, does Mr. Smith's declaration describe the event as occurring around March 27, 2013. Third Smith Decl. ¶ 15. However, the involved parties characterize the meeting as one to address earlier events, *see, e.g*., Simmons Decl. ¶ 27; October 23, 2014 Declaration of Robert Smith ("Second Smith Decl.") ¶ 15 (describing the meeting as one "to discuss Mr. Dunn's behavior"), Newell Decl. ¶ 14 (describing meeting as one about Mr. Dunn calling her an "idiot"). In addition, Plaintiff's filings include an email reporting the incident to Ms. Simmons that is dated April 1, 2014. Pl.'s Opp'n Ex. 44, ECF No. 19-46. Thus, the most logical interpretation is that the meeting in question occurred around March 27, 2014, in response to the February 21, 2014, altercation involving Mr. Dunn and Ms. Newell. Taking the non-movant (Ms. Newell's) evidence as true, *Anderson*, 477 U.S. at 255, the Court adopts this interpretation.

reported the incident to her direct supervisor at the time, James Riddick, who escalated the issue to his supervisor, Ms. Simmons. *See* Supervisors' Email Chain Regarding Wheelock Incident. Plaintiff also reported the issue to BEP security. Newell Decl. 6. Ms. Newell states that Mr. Wheelock "got counseled and was force[d] to stay a distance" away from her. *Id*. at 8. The agency's formal investigation concluded that the "supervisors took actions to separate the involved parties," and that Ms. Newell had "accepted the apology of the alleged aggressor and [was] satisfied with the working environment," such that no further administrative action was required to address the incident. Def.'s Exhibits Ex. 43, Report of Investigation 2, ECF No. 19-45; *see also id*. at Ex. 46, Memorandum Regarding Completed Investigation (indicating "NEWELL is satisfied with the actions taken"), ECF No. 19-48.

Finally, Plaintiff's hostile work environment claim also involves a separate event with a supervisory official, Mr. Smith. On an unspecified date in March 2014, while Ms. Newell was still working on the night shift as a Temporary Assistant Supervisor, Mr. Smith—the day shift supervisor—stayed late to check in with shop floor employees. Pl.'s SMF 14–15. The parties' accounts of this evening diverge. Ms. Newell states that Mr. Smith held a segregated meeting that included only white males. *Id*. 15. Mr. Riddick, an Assistant Plate Printing Supervisor present on the floor, confirms that "there was a meeting and all white males were present," while "four black females and one black male in the room . . . were not made part of the meeting." Pl.'s Opp'n Ex. 51, Declaration of James Riddick 5, ECF No. 19-53. Another employee, Intaglio Plate Printer Deirdre Veney, witnessed the meeting and found it "to be racially [biased] and sexist . .. due to the fact that all the attending printers were Caucasian and male." *Id*. at Ex. 49, Declaration of Deirdre Veney, ECF No. 19-51. Mr. Smith contends that any such division was happenstance: the meeting's demographics were a byproduct of the fact that he began his rounds

at the press occupied by the most senior plate printers, all of whom were white males. Second Smith Decl. ¶¶ 22–23. He states that he proceeded to have the same informal conversation at other printing presses, including African American female Plate Printers. *Id*. ¶¶ 24–25. None of the other incidents expressly involve race, although the individual incidents described above each involved a confrontation between Ms. Newell and a white, male co-worker.

On August 7, 2014, Ms. Newell amended her initial EEO complaint of discrimination to include claims related to the above-described events. Pl.'s Opp'n Ex. 40, EEO Amended Acceptance Letter, ECF No. 19-40. This complaint was formally acknowledged in an August 11, 2015, letter accepting for investigation whether Ms. Newell was "subjected to sexual harassment and/or a hostile work environment based on race (African American) and sex (female)." *Id*. at Bates No. 00074. On September 29, 2017, the agency issued a final decision with a "finding of no discrimination" for all asserted claims. Pl.'s Opp'n Ex. 41, Dep't of Treasury Final Agency Decision 10, ECF No. 17-41.

### 3. 2015 Non-Selection for Permanent Position

Separately, as previously mentioned, Ms. Newell's complaint includes allegations of discriminatory and retaliatory non-selection for a permanent Plate Printer Assistant Supervisor position. In late March 2015, the agency posted a vacancy announcement for two such positions, to which Plaintiff applied. Pl.'s SMF 17. Ms. Newell advanced to the interview stage along with eight other eligible candidates. *Id*. However, in July 2015, this vacancy was canceled without explanation. *Id*. at 18. In August 2015, the agency re-posted the same vacancy announcement, this time for three available positions. *Id*. at 18–19. Plaintiff again applied and received an interview. *Id*. at 19, 21. In October 2015, she was notified that she had not been selected for the position. *Id*. at 33. However, Ms. Newell asserts that she "was unaware that

[her] non-selection was discriminatory until" 2017, when she "overheard a conversation discussing" the selected individuals' qualifications. *Id*. at 34. Thereafter, on August 25, 2017, Ms. Newell contacted an EEO counselor to initiate a complaint alleging that she was "discriminated against on the basis of race (African-American), sex (female) and reprisal (prior EEO activity)" when she was not selected for the 2015 Plate Printer Assistant Supervisor position and when she learned on August 18, 2017 "that several employees who were Acting Supervisors, at the time of the announcement, and one employee who was not acting as a supervisor, were made permanent for the position of Plate Printer Assistant Supervisor." Def.'s Exhibits Ex. 93-A, Notice of Right to File a Discrimination Complaint, ECF No. 19-95. Ms. Newell filed a formal complaint on December 4, 2017, and the agency subsequently issued a final decision dismissing the 2017 EEO complaint on the grounds that Ms. Newell had failed to comply with Title VII's requirements for timely filing of claims. Pl.'s Opp'n Ex. 94, Dep't of the Treasury 2017 Final Agency Decision 1, ECF No. 19-96.

### 4. "On the Spot" Bonus and Training Opportunity

Plaintiff's initial 2017 EEO counseling outreach also mentioned two further allegations that were not addressed by the agency in its final decision, *see* Pl.'s Opp'n Ex. 94, 2017 Final Agency Decision, ECF No. 19-96, and which Plaintiff now raises before the Court. Specifically, the handwritten submission in the initial contact sheet for Ms. Newell's 2017 EEO consultation stated that she "ha[d] been denied classes that would help position [her] for a promotion" and that "Richard Zachmann was allowed to take th[is] class" and also that she "wanted to file [a] retaliation complaint on the denial of a bonus and these other issues on Monday, August 14[, 2014]." Pl.'s Opp'n Ex. 93, BEP Office of Equal Opportunity and Diversity Management Initial Contact Sheet 5, ECF No. 19-95; *see also* Pl.'s SMF 34–36. These claims were not mentioned in

the EEO notice of right to file a complaint, *see id*. at Ex. 93-A, the informal EEO complaint, *see id*. at Ex. 93-B, or the formal EEO complaint filed on December 4, 2017, *see* Def.'s Exhibits Ex. 35, ECF No. 17-35, all of which included only the non-selection allegations described above.

The allegations concerning denial of a bonus arise from BEP's practice of giving "on the spot" awards at management's discretion. Pl.'s SMF 34. The parties agree that Ms. Newell was not initially granted such a bonus in 2017, but their accounts of this event are disputed. Ms. Newell asserts that her name was included for such a bonus and that others on her team were granted this bonus, but she was excluded until she filed a grievance. Pl.'s Resp. Def.'s First Set of Interrogatories ¶ 17. Defendant states that Ms. Newell was not selected for a bonus because the employees who received the "on the spot" award that year worked on the daytime shift, whereas Plaintiff was employed on the nighttime shift during that year. Pl.'s SMF 34. Plaintiff was ultimately awarded the bonus after she internally appealed this matter. Pl.'s Resp. Def.'s First Set of Interrogatories ¶ 17 ("I did not receive a bonus until I filed a grievance about it. Only then was one approved."); *see also* Pl.'s Opp'n 24 (indicating Plaintiff received the bonus after contesting the decision).

The training opportunity at issue also arose in 2017. On February 16, 2017, Mr. Smith received an email from the coordinator for BEP's Lean Sigma Six ("LSS") courses, Jeffrey Freeman, indicating that Ms. Newell had asked for permission to attend an LSS "green-belt" course that would require her to be off of the printing press for a total of two weeks in March and April 2017. *Id*. 35–36. Defendant states that Mr. Smith denied this training request due to staffing needs on the evening shift, where Plaintiff works. *Id*. at 36. Plaintiff disputes this explanation, asserting that "[t]here are at least 15 other evening shift employees to cover for [her]" and pointing to the fact that "[a] white[] male with no known EEO activity also had the

same amount of coverage but was approved for the training." *Id.* Neither this aspect of Plaintiff's complaint nor her allegations concerning denial of a bonus were included in the formal complaint accepted by the agency for investigation in 2017, which was limited to the above-described discriminatory and retaliatory non-selection allegation. *See* Dep't of the Treasury 2017 Final Agency Decision 1 (dismissing allegation that Ms. Newell was "discriminated against on the basis of race[,] . . . sex[,] . . . and in retaliation for prior protected activity . . . when, in 2015, she was not selected for . . . permanent supervisor positions").

### III. LEGAL STANDARD

#### 1. Motion for Summary Judgment

Summary judgment is proper when "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). A "material" fact is one capable of affecting the substantive outcome of the litigation. *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A dispute is "genuine" if there is enough evidence for a reasonable finder of fact to decide in favor of the non-movant. *See Scott v. Harris*, 550 U.S. 372, 380 (2007).

Summary judgment endeavors to streamline litigation by disposing of factually unsupported claims or defenses and thereby determining whether trial is genuinely necessary. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323–24 (1986). The movant bears the initial burden of identifying portions of the record that demonstrate the absence of any genuine issue of material fact. *See* Fed. R. Civ. P. 56(c)(1); *Celotex*, 477 U.S. at 323. In response, the non-movant must point to specific facts in the record that reveal a genuine issue that is suitable for trial. *See Celotex*, 477 U.S. at 324. In considering a motion for summary judgment, a court must "eschew making credibility determinations or weighing the evidence[,]" *Czekalski v. Peters*, 475

F.3d 360, 363 (D.C. Cir. 2007), and all underlying facts and inferences must be analyzed in the light most favorable to the non-movant, *see Anderson*, 477 U.S. at 255. Nevertheless, conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial. *See Greene v. Dalton*, 164 F.3d 671, 675 (D.C. Cir. 1999).

## 2. Procedural Requirements in Title VII Suits

Title VII "provides that before filing suit, an individual alleging that a federal agency engaged in employment discrimination must seek administrative adjudication of the claim." *Scott v. Johanns*, 409 F. 3d 466, 468 (D.C. Cir. 2005) (citing 42 U.S.C. § 2000e–16). More specifically, as relevant here, a federal government employee who "believe[s] they have been discriminated against on the basis of" race or gender "must consult a Counselor prior to filing a [formal EEO] complaint in order to try to informally resolve the matter." 29 C.F.R. § 1614.105(a). Such contact must be initiated "within 45 days of the date of the matter alleged to be discriminatory or, in the case of personnel action, within 45 days of the effective date of the action." *Id.* at § 1614.105(a)(1). If an individual thereafter chooses to file a formal complaint, the agency must, within 180 days of the filing, "conduct an impartial and appropriate investigation of the complaint," *id.* at § 1614.106(e)(2), "provide the complainant with a copy of the investigative file," and notify the individual "that, within 30 days of [receipt of] the investigative file," she "may request . . . an immediate final decision" from the relevant agency or, in the alternative, pursue other forms of further administrative relief, *id.* at § 1614.108(f). Upon receipt of the final agency action on a complaint, the individual may, within ninety days, file a civil action in U.S. district court. *Id.* at § 1614.407. These administrative deadlines "are not jurisdictional. Rather, they function like a statute of limitations and 'like a statute of

limitations, [are] subject to waiver, estoppel, and equitable tolling.'" *Brown v. Marsh*, 777 F.2d 8, 14 (D.C. Cir. 1985) (quoting *Zipes v. Trans World Airlines, Inc.*, 455 U.S. 385, 393 (1982)).

"Because untimely exhaustion of administrative remedies is an affirmative defense, the defendant bears the burden of pleading and proving it." *Bowden v. United States*, 106 F.3d 433, 437 (D.C. Cir. 1997) (citing *Brown*, 777 F.2d at 13). If a defendant carries this burden, dismissal is proper. *See Payne v. Salazar*, 619 F.3d 56, 65 (D.C. Cir. 2010) (affirming trial court's dismissal of plaintiff's claim for failure to exhaust administrative remedies); *Sierra v. Hayden* ("*Sierra I*"), 254 F. Supp. 3d 230, 236–37 (D.D.C. 2017) (dismissing plaintiff's Title VII claim because of failure to exhaust administrative remedies). More than meager, conclusory allegations that the plaintiff failed to exhaust her administrative remedies are required to discharge this burden. *Brown*, 777 F.2d at 12.

Additionally, in federal district court actions brought under Title VII, a court has authority over only those claims that are contained in the plaintiff's administrative complaint or claims "like or reasonably related to" those claims in the administrative complaints. *Park*, 71 F.3d at 907; *see also Haynes v. D.C. Water & Sewer Auth.*, 924 F.3d 519, 526–27 (D.C. Cir. 2019) (citing *Park*, 71 F.3d at 907); *Kennedy v. Whitehurst*, 690 F.2d 951, 961 (D.C. Cir. 1982)). A "reasonably related" claim "must[,] at a minimum[,] . . . arise from the administrative investigation that can reasonably be expected to follow the charge of discrimination." *Haynes*, 924 F.3d at 526–27 (citing *Payne*, 619 F.3d at 65) (internal quotation marks and alteration omitted).

## IV. ANALYSIS

Ms. Newell's claims in the suit filed in this Court arise from two EEO complaints that she filed in 2014 and 2017. Defendant argues that, except for the discrimination claim based on

her 2014 reassignment and the claim for denial of a bonus, all the claims that Ms. Newell has presented to the Court suffer from procedural deficiencies and, accordingly, summary judgment should be granted in the agency's favor.[9]  *See* Def.'s Mem. 10 ("Plaintiff Failed to Timely Exhaust Her Administrative Remedies for Each and Every Discrete Alleged Unlawful Employment Action").  Defendant also argues that the agency has offered a legitimate, non-discriminatory reason for the 2014 reassignment and 2017 denial of a bonus, respectively, and urges the Court to grant summary judgment on these claims.  For the reasons set forth below, the Court agrees with Defendant: the claims alleging retaliation in 2014, non-selection in 2015, and discriminatory and retaliatory denial of a training opportunity in 2017, respectively, do not clear Title VII's procedural bar because Plaintiff did not timely exhaust these claims administratively, and Plaintiff does not establish a genuine issue of material fact sufficient to survive summary judgment on her other claims.

## A.  Discovery Conduct

Before assessing the pending motion for summary judgment, the Court discusses a procedural matter raised by Ms. Newell: whether discovery sanctions are appropriate here.  Plaintiff's opening argument in her opposition to Defendant's motion for summary judgment asserts, for the first time, that Defendant should be sanctioned for its discovery conduct and "reli[ance] upon information not timely produced during the discovery period."  Pl.'s Mot. Opp'n Def.'s Mot. Summ. J. ("Pl.'s Opp'n") 8, ECF No. 19.  This allegation centers on

---

[9] The agency properly raised this affirmative defense in its answer.  *See* ECF No. 7 (stating, as its first defense, that "Plaintiff is barred from bringing any claims that she did not timely present to the Agency and for which she did not properly exhaust her administrative remedies").  And it further provided description of its exhaustion defenses in response to Plaintiff's interrogatories during discovery.  *See* Def.'s Exhibits Ex. 43, Def.'s Resp. Pl.'s First Set of Disc. Req. ¶¶ 7–8, ECF No. 17-43.  Accordingly, contrary to Plaintiff's argument, Defendant has not waived or forfeited its failure to exhaust defenses.

Defendant's supplemental production of documents after the close of discovery. The Court will briefly recount salient discovery dates and litigation timing to contextualize the parties' arguments.

Discovery in this suit closed on November 5, 2018. *See* Scheduling Order, ECF No. 9. Defendant's first supplemental production came after this date. On March 8, 2019, one week before filing its motion for summary judgment, Defendant emailed Plaintiff that "the Agency very likely has additional responsive documents relating to the 2015 non-selection" and that it would therefore "need to make a supplemental document production." Pl.'s Opp'n Ex. 98, ECF No. 19-100. Defendant initially proposed a thirty-day postponement of briefing deadlines to accommodate the supplemental production. *Id.* According to Defendant, Plaintiff opposed this extension, *see* Def.'s Mot. for Extension of Time 1, ECF No. 15, whereupon Defendant moved for a two-day extension of the original summary judgment briefing schedule, which Plaintiff also opposed, *id.* at 1–2. The Court granted this two-day extension over Plaintiff's objection, *see* Min. Order (Mar. 12, 2019), and Defendant subsequently filed its motion for summary judgment on March 15, 2019, *see* Def.'s Mot. Summ J., ECF No. 16.

A further supplemental production followed. On April 5, 2019, Defendant sent an email notifying Plaintiff's counsel that it was again supplementing document production to provide 150 pages of additional documents pertinent to Plaintiff's 2015 non-selection claim. Pl.'s Opp'n Ex. 100, ECF No. 19-102. Plaintiff then moved for a forty-five-day extension of its deadline to respond to Defendant's motion for summary judgment, which Defendant did not oppose. Pl.'s Mot. for Extension of Time, ECF No. 18. This Court granted the unopposed motion, *see* Min. Order (Apr. 12, 2019), and Plaintiff filed her opposition on May 28, 2018, *see* Pl.'s Opp'n.

Now, Plaintiff contests this supplemental production as part of her opposition to Defendant's motion for summary judgment. Plaintiff did not bring any further motions seeking discovery sanctions or otherwise indicating that Defendant improperly concealed the documents or that the supplemental production unfairly prejudiced her. Although confusingly not styled or filed as a separate motion for sanctions, the heart of Plaintiff's present objection seems to be that the late document production after the close of discovery was in violation of the Court's May 5, 2018 Scheduling Order, ECF No. 9, such that the Court should award sanctions pursuant to its authority under Federal Rules of Civil Procedure 16(f) and 37(b), *see* Pl.'s Opp'n 8–9. Plaintiff characterizes Defendant's late production as a strategic move to "advantage its case and prejudice Plaintiff's case by "prevent[ing] [her] from seeking the deposition of pertinent witnesses or seeking additional discovery." *Id.* at 10. As such, Defendant's untimely late production, Plaintiff argues, cannot be excused under Rule 26(e)'s duty to supplement. *Id.* at 9 (citing *Shatsky v. Syrian Arab Republic*, 312 F.R.D. 219, 225 (D.D.C. 2015)). She thus asserts that the Court should "either strike from the record or, alternatively, disregard" the late-produced material. *Id.* at 8.

Defendant retorts that Plaintiff's request is both procedurally improper and unwarranted on the merits. First, Plaintiff failed to file any motion for sanctions pursuant to Federal Rule of Civil Procedure 37(b). Def.'s Reply 24. Second, Defendant points out that there is no evidence of bad faith or an abuse of the judicial process, such that sanctions are warranted; to the contrary, Defendant's incomplete initial production was a "inadvertent oversight on the part of the agency," and Defendant "took immediate steps to correct the error." *Id.* at 25. Moreover, Defendant was open to an extension of the briefing schedule—which it sought, as described above, over Plaintiff's objection—and "informed Plaintiff prior to filing its Motion [for

Summary Judgment] that it would not oppose a reasonable request to reopen discovery if Plaintiff deemed it necessary." *Id.* Defendant thus urges the Court to deny Plaintiff's request for discovery sanctions. As set forth below, Defendant has the better argument, and the Court will not impose any discovery sanctions and will consider the exhibits that were produced in Defendant's supplemental production to the extent that they bear on the Court's analysis.

Here, the facts do not warrant the imposition of sanctions under either of the cited rules. Rule 37(b) authorizes a court to issue sanctions "for not obeying a discovery order." Fed. R. Civ. P. 37(b)(2)(A). And Rule 16(f) states that "the court may issue any just orders, including those authorized by Rule 37(b)(2)(A)(ii)-(vii), if a party or its attorney" "fails to obey a scheduling or other pretrial order." Fed. R. Civ. P. 16(f)(1)(C). But the instant case does not fall within the scope of either of these provisions. Under the law of this Circuit, "[a] production order is generally needed to trigger Rule 37(b)." *Shepherd v. Am. Broad. Cos., Inc.*, 62 F.3d 1469, 1474 (D.C. Cir. 1995) (quoting *Attorney General v. The Irish People, Inc.*, 684 F.2d 928, 951 n. 129 (D.C. Cir.1982)) (citing Jamie S. Gorelick, Stephen Marzen & Lawrence Solum, Destruction of Evidence § 3.4, at 74 & n 23 (1989 & Supp. 1995) ("[f]ederal court decisions ... unanimously agree that sanctions pursuant to Rule 37 may not be awarded absent violation of a court order")). There was no production order required in this case, as Defendant notes, *see* Def.'s Reply 25, such that Rule 37(b) is not triggered.

Nor do the facts before the Court support the conclusion that Defendant acted in bad faith and intentionally flouted the Court's scheduling order by producing the documents at the time that it did, such that a "just order" pursuant to Rule 16(f) is in order. Plaintiff's argument, at bottom, is that she was prejudiced by the untimely disclosure of documents. Pl.'s Mot. 10. But Plaintiff does not explain how, exactly, she was prejudiced, such that the Court must intervene to

ensure the administration of justice.  As explained in the case on which Plaintiff primarily relies, *Shatsky*, "[a] litigant's failure to abide by discovery deadlines is prejudicial *when it prevents the opposing party from timely reviewing relevant evidence*."  312 F.R.D. at 226 (emphasis added) (citing *Moore v. Napolitano*, 723 F. Supp. 2d 167, 181–82 (D.D.C. 2010); *Klayman v. Judicial Watch, Inc.*, 256 F.R.D. 258, 262 (D.D.C. 2009)).  In this case, Plaintiff's own actions undermine the contention that she was prevented from timely reviewing relevant evidence.  After rejecting Defendant's informal invitations to extend time and/or to reopen discovery, *see* Def.'s Reply Ex. 48, ECF No. 21-4, Plaintiff moved for, and was granted, forty-five additional days to "review the three supplemental document productions, to better understand how the Agency has used them in its motion[,] and [to] incorporate them into its Response to the Agency's Motion for Summary Judgment,"[10]  Pl.'s Mot. for Extension of Time 2.  Accordingly, Plaintiff was not in fact prevented from timely reviewing relevant evidence.  Nor has Plaintiff convincingly argued that she was prevented from deposing agency personnel about these documents because Defendant offered to re-open discovery for this purpose and Plaintiff declined.  Plaintiff did not take any depositions in this case and it is, thus, unlikely that a handful of supplemental documents would have changed the calculus.

In short, there is no evidence that Defendant's late production was anything more than an attempt to comply with its Rule 26(e) duty to supplement as soon as it realized the agency's "inadvertent oversight."  Def.'s Reply 25.  Such an oversight may not be ideal, yet it does not automatically signal intentional concealment until the eleventh hour as part of a deliberate strategy to disregard the Court's scheduling order and prejudice Plaintiff.  The facts here are

---

[10] This motion references a supplemental production of three additional documents on March 16, 2019.  Pl.'s Mot. for Extension of Time 1.  Plaintiff's opposition only discusses two supplemental productions, as summarized above.

distinct from cases in which parties failed to respond to discovery requests at all or more flagrantly disrespected discovery deadlines. *See, e.g.*, *Unique Industries, Inc. v. 965207 Alberta Ltd.*, 764 F. Supp. 2d 191, 202 (D.D.C. 2011) (counsel's delay in production suggested lack of diligence in investigating issues); *Perez v. Berhanu*, 583 F. Supp. 2d 87, 91 (D.D.C. 2008) (party failed to respond to motion for sanctions or to appear at status hearing). If anything, Defendant's emails are evidence of good faith: Defendant was willing to work with Plaintiff to ensure that she was not prejudiced by these supplemental productions, and Defendant promptly notified the Court of this development in its motion for an extension of time. *See* Def.'s Mot. for Extension of Time 1. Moreover, the fact that Plaintiff was able to file a responsive motion within the forty-five-day extension and did not seek to reopen discovery suggests that the production did not unduly delay the litigation. Thus, the Court will not exercise its authority to order sanctions or exclude from the record any documents associated with the supplemental production.

### B. Claims Arising from 2014 EEO Complaint

#### 1. 2014 Retaliation Claim

Ms. Newell's complaint includes allegations that Defendant retaliatorily demoted her in 2014 after she began to complain about her disparate treatment. [11] Compl. 1; *see also id.* ¶ 19 ("After numerous complaints by Newell, instead of stopping the [illegal] behaviors, Newell alleges that she was demoted to remove her from the position that triggered the most opposition from the White males in her department and the position that allowed her to witness the sexual behavior of her managers."). Defendant contends that Plaintiff's failure to assert retaliation in her first administrative complaint precludes her from bringing this claim in the instant case.

---

[11] These allegations are distinct from allegations of retaliation associated with Plaintiff's 2015 non-selection claim, which the Court discusses below.

Def.'s Mem. 1. Plaintiff does not provide a direct rejoinder. On the Court's best read of her arguments in opposition, Ms. Newell suggests—albeit in the context of the 2015 non-selection claim—that the retaliation claim is "sufficiently related to Ms. Newell's other allegations to warrant exhausting her remedies." Pl.'s Opp'n 32–33. Ms. Newell also appears to broadly suggest, again in the context of the other allegations, that "any delay in filing should also be waived or tolled, particularly . . . [for parties] acting *pro se*, like [she] was at the time of [the] first EEO case." *Id.* at 31–32 (citing *Bowden*, 106 F.3d at 438).

Even with a generous read of Plaintiff's assertions, Defendant has the better argument. Because Defendant acknowledges that Plaintiff exhausted the 2014 discrimination administrative complaint, *see* Def.'s Mem. 2, the operative question is whether the retaliation claim pled in Plaintiff's complaint may be brought in association with that administrative complaint. A Plaintiff who files a suit in federal district court after administratively exhausting an administrative complaint is "limited in scope to claims that are 'like or reasonably related to the allegations of the . . . [claim in the administrative complaint] and growing out of such allegations.'" *Park*, 71 F.3d at 907 (quoting *Cheek v. Western and Southern Life Ins. Co.,* 31 F.3d 497, 500 (7th Cir. 1994)). In this suit, as Defendant notes, the administrative claims accepted by the agency for investigation in 2014 do not reference retaliation. *See* Def.'s Mem. 1, 11; Def.'s Reply in Support of Def.'s Mot. Summ. J. ("Def.'s Reply") 3–4, ECF No. 21. The first 2014 filing addresses only "[w]hether Complainant was subjected to *disparate treatment* based on race (African-American), sex (female), and age (over 40)," ECF No. 19-40 (emphasis added), and the amended complaint letter addresses only whether Ms. Newell was "subjected to *sexual harassment and/or a hostile work environment* based on race (Africa American) and sex (female)," ECF No. 19-43 (emphasis added). Thus, based on the plain text of the formal

administrative complaint, it is clear that the retaliation claim is not "like" the allegations in the administrative complaint itself.

Nor is the retaliation administrative claim "reasonably related to the allegations of the . . . [complaint] and growing out of such allegations." *Haynes*, 924 F.3d at 526 (quoting *Park*, 71 F.3d at 907).[12] The "like or reasonably related" standard is not open-ended: "[a]t a minimum, the Title VII claims must arise from 'the administrative investigation that can reasonably be expected to follow the charge of discrimination.'" *Park*, 71 F.3d at 907 (first quoting *Cheek,* 31 F.3d at 500, then quoting *Chisholm v. United States Postal Service,* 665 F.2d 482, 491 (4th Cir. 1981) (footnote omitted)); *see also Payne*, 619 F.3d at 65. This connection is not meant to impose technical formalities on Title VII claimants; rather, it is "necessary to give the agency 'an opportunity to resolve [the] claim administratively before [the employee] file[s] her complaint in district court.'" *Haynes*, 924 F.3d at 526–27 (quoting *Wiley v. Glassman*, 511 F.3d 151, 160 (D.C. Cir. 2007)).

Here, the administrative claims that the agency accepted center entirely on discrimination and hostile work environment/harassment theories of relief. Based on such claims, the administrative investigation that the agency undertook cannot "reasonably be expected," *Park*, 71 F.3d at 907, to address the claims of retaliation that Plaintiff now raises before this Court. This is not merely a formalistic point; to the contrary, what a plaintiff must demonstrate to show motivation or intent in each kind of case is entirely different. *See, e.g.*, *Wiley v. Glassman*, 511

_____

[12] In dicta in *Haynes*, the Circuit declined to decide whether the "like or reasonably related" doctrine enumerated in *Park* survived the Supreme Court's rejection of the "continuing violation" doctrine in *National Railroad Passenger Corp. v. Morgan*. *Haynes*, 924 F.3d at 527 n.1 (discussing *Morgan*, 536 U.S. 101, 110-14 (2002)). Thus, *Park* remains good law. Here, as detailed below, Ms. Newell "cannot even meet the standard set forth in *Park*," *id.* at 526 n.1; accordingly, Plaintiff did not administratively exhaust her remedies as required by this Circuit's controlling law.

F.3d 151, 155 (D.C. Cir. 2007) (stating that a prima facie case of discrimination requires a plaintiff to show that "(1) she is a member of a protected class; (2) she suffered an adverse employment action; and (3) the unfavorable action gives rise to an inference of discrimination," whereas a prima facie case of retaliation requires a plaintiff to show that (1) she engaged in a statutorily protected activity; (2) she suffered a materially adverse action by her employer; and (3) a causal connection existed between the two" (internal quotation marks and citations omitted); *Taylor v. Small*, 350 F.3d 1286, 1292 (D.C. Cir. 2003) (similarly distinguishing causes of action); *see also Burlington N. & Santa Fe Ry. Co. v. White*, 548 U.S. 53, 61, 67 (2006) ("The language of . . . [Title VII's] substantive [discrimination] provision differs from that of the antiretaliation provision."); *Morales v. Gotbaum*, 42 F. Supp. 3d 175, 188 (D.D.C. 2014) (noting that plaintiff's burden to defeat summary judgment differs in context of disparate treatment and retaliation claim, respectively).  In particular, because a discrimination claim does not require a plaintiff to show evidence of prior protected activity and a retaliation claim does not require a plaintiff to show evidence of race/gender animus, what is relevant in the context of one kind of claim may not be relevant in the other, and vice versa.  Logically, then, an agency on the alert for evidence related *only* to a discrimination claim would not necessarily investigate for evidence that could be related to a retaliation claim.  Thus, because Plaintiff's first EEO complaint in 2014 did not present any retaliation claim, nor is this claim reasonably related to the claims that were timely presented therein, no reasonable finder of fact could conclude that Ms. Newell administratively exhausted her retaliation claim.[13]

---

[13] As the Court noted previously, Defendant raised Plaintiff's failure to administratively exhaust her claims as an affirmative defense and provided specific argumentation to support its argument that the retaliation claim is not connected to claims that were timely administratively exhausted.  These actions carry its burden to invoke such an affirmative defense.  *See Brown*, 777 F.2d at 12.

Plaintiff's contention that the Court should waive or toll "any delay in filing" does not alter this conclusion.[14] Ms. Newell asserts that the Court should waive or toll her delay because her employers "provided ineffective notice as to the limitations period," which was particularly harmful because she was proceeding *pro se* at the time of the first EEO complaint. Pl.'s Opp'n 31–32. For the following reasons, this argument is unavailing.

"[T]he plaintiff bears the burden of showing that she is entitled to equitable tolling." *Harris v. Gonzales*, 488 F.3d 442, 444 (D.C. Cir. 2007) (citing *Harris v. Att'y Gen. of the United States*, 400 F. Supp. 2d 24, 26 (D.D.C. 2005)). A litigant "is entitled to equitable tolling only if [s]he shows (1) that [s]he has been pursuing [her] rights diligently, and (2) that some extraordinary circumstance stood in [her] way and prevented timely filing." *Dyson v. District of Columbia...*, 710 F.3d 415, 421 (D.C. Cir. 2013) (quoting *Holland v. Florida,* 560 U.S. 631 (2010)); *see also Briggs v. Hayden*, No. 18-5081, 2019 WL 2563218 (quoting *Pace v. DiGuglielmo*, 544 U.S. 408, 418 (2005)). Courts have granted equitable tolling in cases where, for instance, a *pro se* party made "diligent but technically defective efforts to act within a limitations period," where one party was "misled about the running of a limitations period," or a "complainant[] neither knew nor had reason to know about the limit." *Bowden*, 106 F.3d at 438 (internal citations omitted). Such equitable tolling is proper only when "despite all due diligence, a plaintiff is unable to discover *essential* information bearing on the existence of [her] claim." *Sierra I*, 254 F. Supp. 3d 230, 241 (D.D.C. 2017) (emphasis in original) (quoting *Pacheco v. Rice*, 966 F.2d 904, 906–07 (5th Cir. 1992)).

---

[14] Plaintiff does not assert a specific theory of waiver, such as the argument that the agency waived its non-exhaustion defense. *See Sierra I*, 254 F. Supp. 3d at 240 (analyzing why agency did not waive defense of untimely exhaustion). Because, as the Court has discussed, Defendant timely asserted the affirmative defense of administrative non-exhaustion, the Court considers only equitable tolling here.

Here, Ms. Newell has not carried her burden to establish that equitable tolling is warranted.  As discussed previously, and as Defendant points out, Plaintiff *never* administratively filed her retaliation claim and raises this allegation for the first time before the Court, *see* Def.'s Reply 4, more than three years after the contested events occurred.  Citing *Bowden*, Plaintiff's sole argument is that her employers did not provide effective notice concerning the limitations period.  Pl.'s Opp'n 31–32 (citing 106 F.3d at 438).  Ms. Newell relies on the fact that she "repeatedly complained of the harassment," yet none of her "supervisors instructed [her] of her right to complain to EEO."  *Id.* at 32.  But "[a]n agency's failure to give notice does not excuse the untimeliness of a complaint, *unless the absence of notice misled the complainant about the time limit's operation*."  *Bowden*, 106 F.3d at 438 (emphasis added).  At no point does Plaintiff state that she was misled by the absence of notice or explain how her employer's ineffective notice misled her about the controlling time limit and led her to omit her retaliation claim from her administrative complaint.  Never does Ms. Newell explain how she was sufficiently aware of the applicable time limits to submit a timely administrative claim of discrimination, yet somehow the agency's failure to give her notice caused her to omit her retaliation claim from that very same complaint.  Thus, the bare allegation that her supervisors did not instruct her of her right to file an EEO complaint cannot sustain Ms. Newell's argument.

The key question, then, is whether Ms. Newell has carried her burden to show that she did not otherwise know or have reason to know about the limit.  *See Harris v. Gonzales*, 488 F.3d 442, 444 (D.C. Cir. 2007) ("[T]he agency must grant an extension [of the forty-five-day limit] if the employee shows that she 'was not notified' or 'otherwise aware' of the time limit." (quoting 29 CDF § 1614.105(a)(2))).  She has not.  On the evidence presented, at a minimum, Ms. Newell had constructive notice of the statutory time limit.  Plaintiff's declaration avers that

she was aware of the agency's anti-harassment and hostile work environment policy and had "seen it on the board." Second Newell Decl. ¶¶ 65–66; *see also* Def.'s Reply Ex. 45, Deposition of Tracy R. Newell ("Newell Dep.") 131–35, ECF No. 21-1 (expressing familiarity with agency's anti-harassment and hostile work environment policies). In addition, Ms. Newell states under oath that, each year, she completed online classes that informed her of "the agency's EEO policy, the anti-harassment and hostile work environment policy." Newell Dep. 80:6–8. As a supervisory official, moreover, in an agency whose policy made "[m]anagers and supervisors . . . responsible for following up on [harassment] complaints," Pl.'s Opp'n Ex. 11, Anti-Harassment Policy Statement, ECF No. 19-13, Ms. Newell would have needed to be well-versed in the relevant policy requirements. Thus, Plaintiff has not provided any reason to conclude that she lacked constructive notice of the relevant time limits. Accordingly, she has failed to provide any basis that would entitle her to equitable tolling of the time-barred claims for retaliation.

All told, then, Ms. Newell provides no further justification that can carry her burden to establish the sort of "extraordinary and carefully circumscribed circumstances," *Harris*, 488 F.3d at 444 (quoting *Smith–Haynie v. District of Columbia,* 155 F.3d 575, 580 (D.C. Cir. 1998)), that warrant equitable tolling. Thus, because Plaintiff has failed to support her plea for the Court to exercise its equitable discretion regarding her retaliation claim, and because no reasonable finder of fact could conclude that Plaintiff administratively exhausted this claim, she may not raise it for the first time before the Court.

### 2. 2014 Discrimination Claim

Ms. Newell alleges that she was discriminated against based on race and sex when she was reassigned from her temporary supervisory capacity to her prior Plate Printer position in March 2014. Plaintiff presents this reassignment as a discriminatory demotion. Ms. Newell

27

maintains that her position became permanent when she was not removed from the Assistant Plate Printer Supervisor position after the expiration of the one-year NTE term in September 2013, in keeping with the "common practice of the department to convert NTE-1-year positions to permanent positions without further notice or competition and without any further HR actions." Compl. ¶¶ 11–12; *see also* Pl.'s SMF 5–6. Thereafter, while acting in a supervisory capacity, Ms. Newell alleges that "the White males in her department became increasingly malicious, hostile[,] and intimidating" and that she was "frequently subjected to a hostile work environment" as well as "frequent pervasive" incidents of sexual harassment, which she reported to her supervisors to no avail. *Id*. ¶¶ 13–18. After she "availed herself of the [BEP's] EEO process" with multiple complaints about this inappropriate conduct, Ms. Newell contends that her supervisors demoted her to Plate Printer in order to "remove her from the position that triggered the most opposition from the White males in her department and the position that allowed her to witness the sexual behavior of her managers." *Id*. ¶ 19.

Defendant describes Ms. Newell's 2014 reassignment rather differently, arguing that it was a decision controlled by HR's construal of governing regulations. Pl.'s SMF 6–7. Specifically, after a three-month extension of the one-year NTE term by one HR supervisor, Mr. Zunker, in September 2013, *id*. at 5, the new HR supervisor, Ms. Mendoza, denied any further extension on the grounds that "the applicable regulations in 5 C.F.C. Part 335 did not permit BEP to extend the[] temporary promotions" because the original vacancy announcement explicitly stated that the position was a temporary promotion NTE one year, *id*. at 6. Thus, Ms. Newell was reassigned to the Plate Printer supervisor position that she had held prior to her temporary supervisory position. *Id*. Defendant emphasizes that several other employees were also returned to their positions around the same time or shortly thereafter as a result of Ms.

Mendoza's interpretation of the operative regulations. *Id.* Defendant specifically points to the fact that Mr. Gibel, who was temporarily promoted to the same Plate Printer Assistant Position at the same time as Ms. Newell, was also returned to his prior post as Acting Assistant Supervisor on March 31, 2014. *Id.* at 6–7.

Plaintiff rebuffs this HR-based explanation as pretextual. She raises two specific points. First, given her own experience with agency promotion practices and the fact that she received a raise and notification of a one-year probationary period in January 2014, Ms. Newell maintains that she was in fact permanently promoted at that time—only to be subsequently demoted on discriminatory grounds because Mr. Smith "capitulated to [the] sexist and racist environment." Pl.'s Opp'n 19–20. Second, Plaintiff distinguishes her case from the other employees who were "returned back to their positions" because she was the only employee whose reassignment entailed a demotion in status. Plaintiff notes that two of the other individuals, Mr. Donovan Elliot and Mr. Smith, "were *laterally* selected from supervisory positions to fill another supervisory position." Pl.'s Opp'n 20. She also rejects the comparison to Mr. Gibel because he was still permitted to perform in a supervisory capacity after the reassignment, given his status as "Acting Assistant Plate Printer Supervisor." *Id.* at 21. Plaintiff thus presses that the explanation provided is pretextual cover for the truth: she was the only employee who was discriminatorily demoted.

Title VII bars intentional discrimination, or "disparate treatment." 42 U.S.C. §2000e-16(a). An employee bringing such a claim for relief "seeks to prove that an employer intentionally 'treats some people less favorably than others because of their race . . . [or] sex." *Figueroa v. Pompeo*, 923 F.3d 1078, 1086 (D.C. Cir. 2019) (quoting *Segar v. Smith*, 738 F.2d 1249, 1265 (D.C. Cir. 1984)); *see also Int'l Bhd. of Teamsters v. United States*, 431 U.S. 324,

335 n.15 (1977).  The plaintiff-employee "at all times" carries "the burden of proving 'that the defendant intentionally discriminated against' her.  *Figueroa*, 923 F.3d at 1086 (quoting *Segar*, 738 F.2d at 1265); *see also Texas Dep't of Cmty. Affairs v. Burdine*, 450 U.S. 248, 253 (1981).  In a case such as this, where there is only indirect evidence of intentional discrimination, the claimant may rely on the *McDonnell Douglas* three-step method of proof.  *Figueroa*, 923 F.3d at 1086 (citing *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1113 (D.C. Cir. 2016); *see also Trans World Airlines, Inc. v. Thurston*, 469 U.S. 111, 121 (1985)).  The first step of this test requires the employee to establish a *prima facie* case, whereupon, at step two, "the burden then shifts to the employer to articulate a legitimate, nondiscriminatory reason for its action." *Wheeler*, 812 F.3d at 1113–14.  Where the employer satisfies this burden of production, the "'burden then shifts back' to the employee, who must prove that, despite the [employer's] proffered reason, she has been the victim of intentional discrimination."  *Figueroa*, 923 F.3d at 1086 (quoting *Wheeler*, 812 F.3d at 1114).  This Circuit has emphasized that, at the summary judgment stage, the district court is generally expected to focus on prong three and to avoid getting caught up in "'largely unnecessary sideshow[s]' about what constitutes a *prima facie* case."  *Id.* (quoting, then citing, *Brady v. Office of Sergeant at Arms*, 520 F.3d 490, 494 (D.C. Cir. 2008)).  But a court should not construe this emphasis on prong three as a reason to elide a serious inquiry at prong two.  *Id.* at 1087 ("*Brady* does not pretermit serious deliberation at the second prong.").

    A court evaluating whether the employer has satisfactorily articulated a "legitimate, nondiscriminatory reason for its action" at prong two, *Wheeler*, 812 F.3d at 1114, is to consider numerous factors.  This Circuit recently emphasized four factors expected "to be paramount in the analysis for most cases."  *Figueroa*, 923 F.3d at 1087.  First, the employer must produce

evidence that would be admissible at trial for a finder of fact. *Id.* (citing *Segar v. Smith*, 738 F.2d 1249, 1268 (D.C. Cir. 1984)). Second, "the factfinder, if it 'believed' the evidence, must reasonably be able to find that 'the employer's action was motivated by' a nondiscriminatory reason." *Id.* (quoting *Teneyck v. Omni Shoreham Hotel*, 365 F.3d 1139, 1151 (D.C. Cir. 2004) (citations omitted). Third, this nondiscriminatory explanation must be "facially 'credible' in light of the proffered evidence." *Id.* at 1088 (quoting *Bishopp v. District of Columbia*, 788 F.2d 781, 788–89 (D.C. Cir. 1986)). Finally, the evidence presented must provide a "clear and reasonably specific explanation" that is "articulated with some specificity." *Id.* (first quoting *Segar*, 738 F.2d at 1269 n.13, then quoting *Loeb v. Textron, Inc.*, 600 F.2d 1003, 1014 (1st Cir. 1979)) (citations omitted). Only if the defendant-employer satisfies these elements at step two is the court to move to step three and assess whether the plaintiff-employee has carried her burden to show that this proffered explanation is pretextual. Applying these principles, this Court next assesses whether Defendant has met its burden to articulate a legitimate, nondiscriminatory reason for Ms. Newell's reassignment in March 2014.[15]

Here, as summarized previously, Defendant asserts that the March 2014 reassignment was not a discriminatory decision by Plaintiff's supervisors, but rather a step taken to enforce the human resource department's construal of the controlling federal regulations. To support its argument, Defendant offers several sources of evidence, including two that are most directly on point: declarations from the HR supervisor who made this decision, Ms. Mendoza. *See* Defs. Exhibits Ex. 9, November 13, 2014 Declaration of Patricia Mendoza ("Mendoza Decl."), ECF

---

[15] Based on the plain text of the accepted administrative complaint and the fact that Defendant does not at any point allege that Plaintiff has failed to make out a *prima facie* case, the Court assumes *arguendo* that Ms. Newell has done so and proceeds to step two of the *McDonnell Douglas* framework.

No. 17-19; *id*. at Ex. 10, March 12, 2019 Declaration of Patricia Mendoza ("Second Mendoza Decl."), ECF No. 17-10.  In these declarations, Ms. Mendoza corroborates the nondiscriminatory reason that Defendant provides for its action, stating that Ms. Newell's three-month extension from September 23, 2013 to March 2014 was an error and that, "[i]n [her] view, permitting a subsequent temporary extension of the advertised not-to-exceed-term governing Plaintiff's temporary promotion as a Plate Printer Assistant Supervisor would have been contrary to the applicable federal regulations and the job vacancy announcement governing Plaintiff's temporary promotion."  Second Mendoza Decl. ¶ 12; *see also* Mendoza Decl. ¶¶ 9–13.  Ms. Mendoza reiterates this same account in her deposition, *see id*. at Ex. 14, Deposition of Patricia Mendoza ("Mendoza Dep.") 20:6–10, 21:9–11, ECF No. 17-15, and the sworn statements of Mr. Smith corroborate the same explanation, *see id*. at Ex. 7, October 17, 2014 Declaration of Robert Smith ("Smith Decl.") ¶ 10, ECF No. 17-7; Second Smith Decl. ¶¶ 5–6; Third Smith Decl. ¶¶ 4–10.  In addition, Ms. Mendoza provides further evidence that, if believed, sustains Defendant's nondiscriminatory rationale for its behavior.  Her declaration discusses in detail how she applied governing regulations to other employees in the same way and similarly advised returning all other individuals in temporary NTE positions to their prior posts upon the expiration of their NTE terms.  *See* Second Mendoza Decl. ¶¶ 15–16.

With this showing, Defendant has offered a relatively specific legitimate explanation for its actions and backed it up with admissible evidence that renders the neutral explanation facially credible, permitting a factfinder who believes it to find that there was a nondiscriminatory reason for BEP's reassignment of Ms. Newell.  Thus, Defendant has satisfied its burden of production at step two of the *McDonnell Douglas* framework, and the Court proceeds next to the final step.

To reiterate, at step three of the *McDonnell Douglas* analysis, a court is to assess whether the plaintiff-employee has provided evidence that discharges her burden to "prove that, despite the [employer's] proffered reason, she has been the victim of intentional discrimination." *Figueroa*, 923 F.3d at 1086 (quoting *Wheeler v. Georgetown Univ. Hosp.*, 812 F.3d 1109, 1114 (D.C. Cir. 2016)). Here, Ms. Newell's first argument is that she was in fact promoted and made permanent by January 2014, only to be discriminatorily demoted in March 2014. She provides four sources of evidence in support of this claim: her own sworn testimony concerning past agency practices; comments on a notification of personnel action ("SF-50") form that she received; the omission of her name on a list of temporary NTE employees, and a line in the declaration from her direct supervisor at the time of her temporary posting, Ms. Simmons.[16]

The problem, however, is that these items do not provide enough evidence to allow a trier of fact to conclude that the proffered explanation is pretextual. First, although Plaintiff avers that it was "common practice" for a "position to automatically become permanent" after a one-year probationary period, Pl.'s SMF 7 (citing Pl.'s Resp. Def.'s First Set of Interrogatories ¶ 4), she does not provide any other extrinsic support for this claim. Even granting the non-movant the generous construal that she is due at the summary judgment stage, this bare allegation is not

_____

[16] In her complaint, Plaintiff also contests Ms. Mendoza's read of the vacancy announcement itself. *See* Compl. ¶ 10 (quoting vacancy posting's statement that the "temporary position may be made permanent without further competition" (emphasis omitted)). She asserts therein that this announcement in no way required her demotion after one year. *Id.* But Ms. Newell does not develop this argument in her opposition and appears at other points to recognize the discretionary nature of this language. *See* Pl.'s SMF 3. Moreover, as discussed below, she does not provide any further evidence to support her allegation that it was the agency's common practice to make such positions permanent after one year. Because of these combined factors, the Court does not consider the vacancy announcement itself to be another source of evidentiary support for Plaintiff's claim.

sufficient to support Plaintiff's contentions. *See Greene*, 164 F.3d at 675 (stating that conclusory assertions that lack evidentiary support cannot establish a genuine issue for trial).

Nor do the SF-50 form and the listing of employees provide enough evidence to suggest that the reassignment was pretext for discrimination. The SF-50 form in question, dated January 12, 2014, is labeled as a "correction" and contains two comments. Pl.'s Opp'n Ex. 17, ECF No. 19-19. First, it states that there is a general pay adjustment "due to application of FWS area increase."[17] *Id*. The amount of this pay increase was fifty-nine cents per hour.[18] Second, it contains the rather inscrutable comment: "Corrects item []45 from subject to completion of 1 year probationary period for assignment to supervisory or managerial position beginning subject to completion of 1 year. Probationary period for assignment to supervisory or managerial position beginning." *Id*. These comments were not present on the SF-50 form that Plaintiff had previously received during her time as a temporary supervisor, *id*. at Ex. 16, ECF No. 19-18, and there is no prior SF-50 form that references any probationary period. Ms. Mendoza represents these comments as erroneously printed and provides no explanation for why or how the error occurred. *See* Mendoza Decl. ¶ 12, Mendoza Dep. 20:4–14. A similar situation holds for a chart that Plaintiff presents as an agency-prepared list of employees in positions NTE 12 months

---

[17] The Court takes judicial notice that "FWS" stands for "Federal Work System" and refers to "a uniform pay-setting system that covers Federal appropriated fund and nonappropriated fund blue-collar employees who are paid by the hour." Office of Personnel Management, *Pay & Leave - Federal Wage System Overview*, https://www.opm.gov/policy-data-oversight/pay-leave/pay-systems/federal-wage-system/ (last visited Nov. 2, 2019).

[18] The Court calculates this amount by subtracting the total salary/award of $58.85 listed in the September 23, 2013 SF-50, Pl.'s Opp'n Ex. 16, ECF No. 19-18, from the total salary/award of $59.44 provided on the January 12, 2014 SF-50, *id*. at Ex. 17. Neither party provides any SF-50 forms dated between September 23, 2013 (the original date of expiration of the NTE position) and January 12, 2014.

between 2010 and 2018.[19]  Pl.'s Opp'n Ex. 102, ECF No. 19-104.  Ms. Newell contends that her omission from this list demonstrates that she was in fact made permanent prior to March 2014, such that her reassignment was a discriminatory demotion.  Pl.'s SMF 3.  Defendant does not explain this omission in its filings or make any mention of this document at all.  But even without understanding why these errors occurred, the comments on the SF-50 form and the omission of Plaintiff from a list of NTE employees are simply not enough to allow a reasonable trier of fact to find that Ms. Newell's position was in fact converted to a permanent one—let alone that she was subsequently discriminatorily demoted.  With regard to this evidence, as Defendant notes, Plaintiff makes no connection at all between the material provided and the allegation that Mr. Smith, who served as her second-level supervisor at the time of the reassignment, "capitulated to [a] racist and sexist environment" and therefore discriminatorily demoted Ms. Newell.  *See* Def.'s Reply 29 (quoting Pl.'s Opp'n 20).  Without linking the evidence proffered to her claim, Ms. Newell's allegations of discrimination remain unsubstantiated.  Thus, this showing does not suffice to carry Plaintiff's burden to "produce[] sufficient evidence for a reasonable jury to find that the employer's asserted non-discriminatory reason was not the actual reason and that the employer intentionally discriminated against the plaintiff."  *Thomas v. Securiguard Inc.*, No. 18-0125 (ABJ), 2019 WL 4860947, at *9 (D.D.C. Sept. 30, 2019).

Finally, Plaintiff suggests that a line in a supervisor's declaration reveals the pretextual nature of Defendant's explanation.  Specifically, Ms. Newell points to Ms. Simmons's statement that, "[o]n Monday March 24, 2014 my supervisor Robert Smith called me and told me that Mrs.

---

[19] This document is not authenticated or labeled with any official agency indicia.  In its analysis, the Court assumes *arguendo* that it is in fact a document prepared by the agency that would be admissible at trial.

Newell's temporary position had been extended," whereupon Ms. Simmons informed Ms. Newell of this extension. Simmons Decl. ¶ 11. However, Defendant rebuts this argument with an email from Mr. Smith to Ms. Simmons, dated March 20, 2014, stating that he was "informed th[at] morning that the Temporary positions for Tracy Newell and Richard Gibel w[ould] not be extended as Assistant Supervisors," that they would be "required to report for duty as a Plate printer on Monday 3/24/14," and directing Ms. Simmons to convey this information to Ms. Newell and Mr. Gibel that evening. Def.'s Exhibits Ex. 12-B, March 20, 2014 Smith Email, ECF No. 17-11. Mr. Smith's own declaration is consistent with this timeline. *Id.* at Ex. 12, Third Smith Decl. ¶¶ 6–10. Plaintiff does not address this email or offer any other directly conflicting accounts of the nondiscriminatory explanation that Defendant proffers. Nor, as Defendant notes, does Ms. Newell point to any evidence to suggest that anyone other than HR was in fact given authority to grant or deny management's extension request. *See* Def.'s Reply 19–20. Accordingly, this single line in a declaration, standing alone, is not enough to carry Ms. Newell's burden of proof to suggest pretext.

Plaintiff's second argument is also unavailing because it is similarly unsubstantiated by the evidence that she presents. Ms. Newell contends that she was treated differently from a male, Caucasian employee, Mr. Gibel, who was in the same NTE position as her at the time of her reassignment and who was also reassigned at approximately the same time. [20] Plaintiff

---

[20] As mentioned previously, three employees apart from Ms. Newell were reassigned at around the same time as Plaintiff. *See* Pl.'s SMF 9. Defendant avers that all these individuals were in temporary positions at the time of the reassignment and that the reclassification occurred based on the same determination by Ms. Mendoza that was applied to Plaintiff. *See id.*; *see also* Mendoza Decl. ¶ 16. Plaintiff disputes that two of the individuals were in NTE positions at the time of their reassignment. Pl.'s SMF 9. Plaintiff's factual allegation relies on the agency-prepared list of employees in positions NTE twelve months between 2010 and 2018, discussed above. *See id.* (citing Pl.'s Opp'n Ex. 102). Because the Court is to take the evidence presented by the non-movant—here, Plaintiff—as true and construe ambiguities in her favor, the Court

36

objects to the fact that she was reassigned to the position of Plate Printer, whereas Mr. Gibel was reassigned to the position of Acting Assistant Supervisor, which allowed him to "perform those same duties in the office after he was returned to his former position (but only in an acting capacity)." Pl.'s SMF 9; *see also* Pl.'s Opp'n 20. However, Ms. Newell does not provide any evidence that she was in fact treated differently from Mr. Gibel. To the contrary, on the material in the record, it appears that both employees were treated similarly in that they were each reassigned to the position that they held before the temporary promotion: Ms. Newell was reassigned to her previously held position, Plate Printer, and Mr. Gibel was reassigned to his previously held position, Acting Assistant Supervisor. Thus, Plaintiff does not carry her burden to provide evidence that would allow a reasonable finder of fact to conclude that Defendant's proffered explanation for reassigning her is pretextual.

In short, then, because Plaintiff has not supported her allegations of discrimination with specific "evidence 'from which a jury could find that the employer's stated reasons were pretextual," *Hairston v. Vance-Cooks*, 773 F.3d 266, 272 (D.C. Cir. 2014) (quoting *George v. Leavitt,* 407 F.3d 405, 413 (D.C. Cir. 2005) (internal alterations omitted)), she has not made a sufficient showing to survive summary judgment on this claim.

---

accepts Plaintiff's claim that two of the three reassigned individuals—Mr. Smith and Mr. Elliott—were *not* in temporary, NTE positions at the time of their reassignment, *see id.* at 8–9, and therefore assesses only Mr. Gibel's reassignment here.

In addition, Plaintiff does not dispute the fact that several other individuals who became permanent Plate Printer Assistant Supervisors applied to and were selected from vacancy announcements, rather than receiving this post after the temporary position was converted to a permanent position. *See id.* at 10. Thus, the Court does not consider such individuals to be relevant points of comparison in assessing whether Plaintiff was discriminatorily demoted from a permanent supervisory post to a lower-paying capacity in the manner that she alleges.

### 3. 2014 Hostile Work Environment Claim

Ms. Newell also raises harassment and hostile work environment claims. As discussed previously, these claims were included in her 2014 EEO complaint and formally accepted by the agency. *See* EEO Amended Acceptance Letter. Defendant argues that, notwithstanding their inclusion in Ms. Newell's amended 2014 EEO complaint, the incidents of harassment that underlie this claim are time-barred. Def.'s Mem. 11 ("[T]he 45-day time limit in which Plaintiff was required to contact an EEO counselor bars most of the discrete acts of harassment and/or hostile work environment alleged."); *see also* Def.'s Reply 5. More specifically, because Plaintiff's first contact with an EEO counselor occurred on May 2, 2014, Pl.'s SMF 36, Defendant asserts that Title VII precludes her from holding the agency "liable for any discrete acts of harassment or hostile work environment that occurred prior to March 18, 2014, which is 45 days before she initiated contact with an EEO counselor." Def.'s Mem. 12. Defendant further argues that, even if one of the acts did in fact occur within the statutory filing period, the time-barred and non-time-barred incidents cannot "qualify as 'part of the same actionable hostile work environment claim'" because they are not "adequately linked." *Id*. at 13 (quoting *Baird v. Gotbaum*, 662 F.3d 1246, 1251 (D.C. Cir. 2011)). Defendant contends that Plaintiff cannot "show that the single incident involving Wheelock that occurred in May 2014 was 'adequately linked' and so 'similar in nature'" to the other alleged incidents that the collective incidents "form a single, continuous hostile work environment claim." *Id*. (quoting *Baird*, 662 F.3d at 1251). Thus, Defendant maintains that this overall claim for relief is time-barred.

Ms. Newell responds in opposition that Defendant has not met its burden to establish that these claims were not timely exhausted. Pl.'s Opp'n 29. Plaintiff makes three arguments

regarding the timeliness of her hostile work environment claim.[21]  First, she invokes *Morgan* for the proposition that "a court determining whether a hostile work environment exists may look to conduct that occurred outside Title VII's limitations period" so long as "an act contributing to the claim occurs within the filing period."  Pl.'s Opp'n 30 (quoting 536 U.S. at 117).  Applying this rule, Ms. Newell contends that her "harassment claims are reasonably related to the discriminatory demotion, which is undisputed as timely filed," *id.*, which makes all the associated hostile work environment and harassment claims timely filed.  Second, she challenges Defendant's characterization of her harassment claims as "discrete acts," presenting all the claims as part of a hostile work environment theory of relief.  *Id.* at 31.  Finally, she again argues that the Court should waive or toll any delay in filing these claims due to the agency's "ineffective notice as to the limitations period."  *Id.* (citing *Bowden*, 106 F.3d at 438).

Plaintiff's arguments are unavailing.  Ms. Newell's argument that the hostile work environment claim is connected to the timely-filed 2014 discrimination claim for her reassignment lacks evidentiary support.  This contention rests on Ms. Newell's allegation that "it was her promotion to a supervisory position that prompted the white[] males in her office to blatantly harass her because of her gender and race."  Pl.'s Opp'n 30–31 (citing Pl.'s Resp. Def.'s First Set of Interrogatories ¶ 5).  In support of this assertion, Plaintiff's filings include sworn statements from co-workers suggesting that certain male Plate Printers were disrespectful toward female employees.  *See, e.g.*, *id.* at Ex. 49, Declaration of Deirdre Veney Bates No. 00419, ECF No. 19-51 ("I think all the females in Plate Printing have been treated

---

[21] Because Ms. Newell states that her harassment claims are not discrete acts, but instead "constitute non-discrete acts constituting a hostile work environment," Pl.'s Opp'n 31, the Court's analysis refers to Plaintiff's "hostile work environment claim" in addressing this aspect of the complaint.

disrespectfully from time to time based on their sex by some of the male co-workers."); *id*. at Ex. 50, Declaration of Jeffrey Swann Bates No. 00406, ECF No. 19-52 (suggesting that Plaintiff had been treated differently "ever since she become a supervisor"); *id*. at Ex. 51, Declaration of James Riddick ("I believe Mr. Dunn thinks there is no role for women in Plate Printing as a printer or supervisor.").  Missing entirely, however, is any evidentiary support that connects any such discrimination by Plaintiff's *subordinates* to the allegation that the 2014 reassignment reflects discriminatory efforts by *management*.  Although the Court's analysis of the pending motion for summary judgment must construe all underlying facts and inferences in the light most favorable to the non-movant, "conclusory assertions offered without any evidentiary support do not establish a genuine issue for trial."  *Sierra v*. *Hayden* ("*Sierra II*"), Civ. No. 16-1804 (RC), 2019 WL 3802937, at *9 (D.D.C. Aug. 13, 2019) (first citing *Anderson*, 477 U.S. at 255, then citing *Greene*, 164 F.3d at 675); *see also Ralls Corp*. *v*. *Comm*. *on Foreign Inv*. *in United States*, 758 F.3d 296, 315 (D.C. Cir. 2014) (stating that the court does "not accept as true . . . the plaintiff's legal conclusions or inferences that are unsupported by the facts alleged").  The bare conclusory assertion that the harassment and hostile work environment claims are related to the timely-filed discrimination claim is not enough.  Without more concrete evidence that Ms. Newell fails to provide, she has not established that the hostile work environment claim is in fact connected to the timely-filed discrimination claim—a linkage that would establish, per *Morgan*, that any time-barred events can be considered as part of the hostile work environment theory. *See* 536 U.S. at 117.

Nor, as the Court discusses below, can Plaintiff's factual allegations independently support a hostile work environment claim based on either sex or race, untethered from the timely-filed claim of discrimination concerning her 2014 reassignment.  The Court will next

assess Plaintiff's sexual harassment and sex-based claim and then separately consider her allegations of racial discrimination.

### a. Allegations of Hostile Work Environment Based on Sex/Gender

Ms. Newell's allegations of sexual harassment and/or a discriminatory hostile work environment based on sex derives from several events centered in early 2014. The relevant events are: (1) the February 11, 2014, conversation with subordinate Peter Steormann inviting Ms. Newell to go to a strip club and to sexually engage with another female employee, *see* Second Newell Decl.; (2) ongoing incidents, increasing in frequency in February 2014, wherein male employees would request "sexual favors under the guise of humor," *id.* ¶ 55, and at least one male employee "referred to [her] as 'Baby' and 'Honey'" and another "touched [her] on the buttock," Pl.'s Resp. Def.'s First Set of Interrogatories ¶ 1; (3) ongoing sexual behavior in the workplace by two unnamed superiors, Second Newell Decl. ¶¶ 60–61; (4) the February 21, 2014, incident with Mr. Dunn wherein he became aggressive and called Ms. Newell an "idiot," Second Newell Decl. 9; (5) the March 27, 2014, meeting with Mr. Dunn and management to address his prior conduct, Newell Decl. ¶ 14; and (6) the May 19, 2014, incident with Mr. Wheelock, wherein he raised his voice at Ms. Newell, Pl.'s SMF 13. Plaintiff contends that this treatment "over a prolong[ed] period" at the hands of "mostly White male offenders and coworkers," Compl. 9; *see also id.* ¶ 16, establishes a discriminatorily hostile work environment. Defendant raises two rebuttals. First, as described previously, Defendant argues that these claims are time-barred because only the May 19, 2014, incident with Mr. Wheelock occurred within the 45-day mandatory reporting window. Def.'s Mem. 12. Second, Defendant argues that the "unwelcome harassment by her white, male coworkers" represents "isolated incidents" that do not rise "to the

level of 'severe or pervasive' conduct" required to establish an actionable hostile work environment.  *Id*. at 35.

As set forth below, Defendant has the better argument.  Assuming *arguendo* that the March 27, 2014, incident represents a timely-filed claim that can sweep in all the other incidents, these events considered in their totality fail to rise to the level of severity or pervasiveness necessary to make out a hostile work environment claim.

The hostile work environment theory of relief derives from the recognition that, "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an abusive working environment,' Title VII is violated."  *Harris v. Forklift Sys., Inc.*, 510 U.S. 17, 21 (1993) (quoting *Meritor Sav. Bank, FSB v. Vinson*, 477 U.S. 57, 65, 67 (1986)).  To make out a hostile work environment claim for relief, the allegedly discriminatory conduct must not only be subjectively perceived as abusive, but also be so 'severe or pervasive' that it 'create[s] an objectively hostile or abusive work environment.'"  *Sierra II*, 2019 WL 3802937, at *12 (quoting *Casey v. Mabus*, 878 F. Supp. 2d 175, 188 (D.D.C. 2012)); *see also Harris*, 510 U.S. at 21. "[T]he ordinary tribulations of the workplace, [*i.e.*,] a series of petty insults, vindictive behavior, and angry recriminations . . . are not actionable under Title VII."  *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir. 2014) (quotation marks and citation omitted); *see also Baird v. Gotbaum*, 792 F.3d 166, 171 (D.C. Cir. 2015) (describing "occasional name-calling, rude emails, lost tempers and workplace disagreements" as "the kind of conduct courts frequently deem uncognizable under Title VII").  To assess whether conduct rises to a cognizable level, a court is to consider the totality of the circumstances, including "the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably

interferes with an employee's work performance." *Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002) (citing *Harris*, 510 U.S. at 21–23)

Here, the incidents to which Plaintiff points are not severe or pervasive in the manner that Title VII demands to make out a claim for relief. Consider, first, the interactions with Mr. Dunn and Mr. Wheelock, which consist of the February 21, 2014 incident with Mr. Dunn during which Mr. Dunn became aggressive, yelled at Ms. Newell, and called her an idiot; the March 27, 2014, meeting with Mr. Dunn, Ms. Newell, and supervising officials to address Mr. Dunn's prior conduct; and the May 19, 2014, incident in which Mr. Wheelock raised his voice at Ms. Newell on the printing floor. Although the record indicates that Mr. Dunn and Mr. Wheelock both shouted angrily at Plaintiff in an unprofessional and inappropriate manner, there was no physical contact, and there is no evidence that she was ever in physical danger. This sort of verbal altercation on a sporadic basis is not actionably severe. *See, e.g.*, *Brooks v. Grundmann*, 748 F.3d 1273, 1277–78 (D.C. Cir 2014) (outbursts and "tactless and ill-mannered" supervisors and co-workers did not create actionable hostile work environment); *Bell v. Gonzales*, 398 F. Supp. 2d 78, 92 (D.D.C. 2005) ("[T]he sporadic use of abusive language also is insufficient to establish a hostile work environment.") (citing *Stewart,* 275 F.3d at 1131, 1134–35); *Singh v. U.S. House of Representatives*, 300 F. Supp. 2d 48, 56 (D.D.C. 2004) (characterizing "loud expressions of disapproval" as "the kinds of normal strains that can occur in any office setting," and not as creating an abusive hostile work environment). Furthermore, the third incident involving Mr. Dunn's alleged comment at the March 2014 meeting may have embarrassed Plaintiff, but it is not so humiliating that a reasonable finder of fact would conclude that it is the sort of comment that "alter[s] the conditions of the victim's employment." *Harris*, 510 U.S. at 21. Moreover, these three incidents were scattered over four months (February to May 2014) and do not establish a

pattern of ongoing discriminatory behavior throughout Ms. Newell's employment at BEP that is

so pervasive as to create a hostile work environment. Rather, they represent the sort of

occasional workplace "tribulation[s]" that fail to amount to an actionable hostile work

environment. In short, then, these allegations concerning Mr. Dunn and Mr. Wheelock are not

actionably severe and pervasive in the manner that Title VII demands.[22]

---

[22] Moreover, because Ms. Newell was not reassigned to her Plate Printer position until March 31, 2014, *see* Pl.'s SMF 7, she was Mr. Dunn's supervisor at the time of both incidents involving Mr. Dunn that Plaintiff raises in support of her hostile work environment claim. As this Court discussed in *Lyles v. District of Columbia*, most hostile work environment claims involve allegations of harassment by a supervisor, which are controlled by the standard set forth in *Faragher v. City of Boca Raton*, 524 U.S 775 (1998), and *Burlington Indus. Inc. v. Ellerth*, 524 U.S. 742 (1998), or allegations of harassment by a co-worker, which are governed by a different standard set forth in *Curry v. District of Columbia*, 195 F.3d 654, 659 (D.C. Cir. 1999). 17 F. Supp. 3d 59, 69 (D.D.C. 2014). Under the *Curry* standard, "when the harasser *is not a supervisor*[,] '[a]n employer may be held liable for the harassment of one employee by a fellow employee (a non-supervisor) if the employer knew or should have known of the harassment and failed to implement prompt and appropriate corrective action.'" *Id.* (emphasis in original) (quoting *Curry*, 195 F.3d at 660). In *Lyles*, this Court distinguished "subordinate-to-supervisor harassment" and applied a modified version of the *Curry* standard to such an instance. *Id.* Under the *Lyles* standard, "[a]n employer may be held liable for the harassment of a supervisor by a subordinate if the employer knew or should have known of the harassment and failed to implement prompt and appropriate action; but *an employer will not be liable* for the sexual harassment of a supervisor by a subordinate *where the supervisor-plaintiff had the ability to stop the harassment and failed to do so*." *Id.* at 70 (footnote omitted) (emphasis added).

While reserving judgment on whether BEP is liable under this standard, the Court notes that Plaintiff reported the Dunn incident to her supervisors, who appear, at a minimum, to have taken prompt action to investigate and attempt to resolve the conflict. *See* Simmons Decl. 8; Def.'s Exhibits Ex. 12-C; Third Smith Decl. ¶ 14. *But see* Pl.'s SMF 33 (asserting that Mr. Dunn was never required to serve his suspension). Because Defendant develops its argument concerning BEP's liability for the first time in its reply brief, *see* Def.'s Reply 17–18 (invoking *Lyles*), after only a passing mention of the fact that "Plaintiff alleges that her white male subordinates harassed her" in the footnote of its initial filing, Def.'s Mem. 14 n.6, the Court does not rest its conclusion on this basis. *See Sitka Sound Seafoods, Inc.*, 206 F.3d 1175, 1181 (D.C. Cir. 2000) (explaining that courts in this Circuit have "generally held that issues not raised until the reply brief are waived," including when a party refers to an argument in its opening brief and then does not argue that point until its reply brief (quoting *Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.C. Cir. 1996))).

Nor does adding the other alleged incidents of sexual harassment by other employees to the equation alter this conclusion as a matter of law. For one, Plaintiff provides no details concerning the allegations against her supervisors, making these contentions entirely conclusory and unsubstantiated. What remains, then, are two further factual allegations: Mr. Steormann's lewd comments inviting her to go to a strip club and to sexually engage with another female employee, *see* Second Newell Decl., and ongoing incidents, increasing in frequency in February 2014, wherein male employees would request "sexual favors under the guise of humor," *id.* ¶ 55, and at least one male employee "referred to [her] as 'Baby' and 'Honey'" and another, Kevin Gillespie, "touched [her] on the buttock," Pl.'s Resp. Def.'s First Set of Interrogatories ¶¶ 1, 9–12. This alleged sexual harassment all occurred prior to Ms. Newell's March 2014 reassignment, during her tenure as a Temporary Assistant Supervisor. Thus, each of the individuals involved was Plaintiff's subordinate at the time of the alleged conduct.

On the record provided, no reasonable finder of fact could conclude that the alleged events amount to actionably severe and pervasive discriminatory conduct towards a supervisory official. The incident with Mr. Steormann, while inappropriate as a matter of proper workplace conduct, was not a repeated offense. Plaintiff states that it occurred "only one time," Second Newell Decl. ¶ 51, and that she addressed it by reprimanding Mr. Steormann, whereupon he apologized, *id.* ¶¶ 48–49, 58–59. Ms. Newell reported the incident to her own supervisor, Ms. Simmons, but she could not have viewed the incident involving her subordinate as too seriously altering the terms of her supervisory position because she ultimately declined to further pursue the matter. Pl.'s SMF 12; Simmons Decl. ¶ 41. Moreover, although Ms. Newell now raises other sexual harassment claims, on the record before the Court, they did not interfere with her workplace conduct to the extent that she, as a supervisor, attempted to redress them herself or by

turning to other administrative channels.  Notably, Plaintiff's supervisors aver that she did not make them aware of any other sexual harassment allegations, nor did any other employees inform them of any such conduct.  Simmons Decl. ¶¶ 42–44, First Smith Decl. ¶ 39–41.  And Plaintiff herself does not provide any further detail concerning the frequency of the other harassing conduct, indicate how she addressed the offending individuals, offer any details or other evidence to pinpoint the frequency of the alleged conduct with any specificity, or otherwise provide factual allegations or further evidence to suggest how it "unreasonably interfere[d] with" her "work performance," *Stewart*, 275 F.3d at 1134–35 (citing *Harris*, 510 U.S. at 21–23), in particular given that, as these employees' supervisor, she appears to have been positioned to address these incidents herself, *see* Anti-Harassment Policy Statement (stating agency policy under which BEP supervisory officials are to respond to such harassment).  Plaintiff has, accordingly, failed to substantiate how her sexual harassment allegations amount to actionably severe and pervasive conduct by her subordinates.  Without more, however, these allegations are not actionable under Title VII.  *See Greene*, 164 F.3d at 675 (no genuine issue for trial based on conclusory assertions offered without evidentiary support).

In sum, then, taking all these incidents together, no reasonable finder of fact could conclude that Ms. Newell was subjected to discrimination based on her sex in a way that was so severe or pervasive that it affected the terms and conditions of her employment.  Thus, the Court grants summary judgment on this aspect of Plaintiff's claim.[23]

---

[23] Because it decides the issue on this basis, and not on the basis that Ms. Newell did not administratively exhaust this claim, the Court does not address Plaintiff's argument that equitable tolling is warranted.

### b. Allegations of Hostile Work Environment Based on Race

In addition to her allegations concerning sex-based discrimination, Plaintiff contends that she was subjected to "different and disparate conditions of employment on the basis of her race." Compl. 1. That said, the majority of her complaint involves allegations of sexual harassment, *see id*. at ¶ 9 (alleging that Ms. Newell "was subjected to numerous incidents of unwelcomed sexual advances, requests for sexual favors[,] and other verbal and physical conduct of a sexual nature") and a hostile work environment based on sex, *see id*. ¶¶ 15–16. Although the reported incidents involved "White males in her department," *id*. ¶ 13, it is sex and not race that appears front and center in all but one of the incidents. The sole factual allegation that directly raises the issue of a hostile work environment based on race is Mr. Smith's March 2014 meeting on the shop floor, which Plaintiff characterizes as "a meeting with all White males" that excluded "all Blacks and females." *Id*. ¶ 14; *see also* Second Newell Decl. ¶ 68 ("Mr. Smith segregated the employees and met exclusively with Caucasian males and the topic of the meeting was black females including me."). Without knowing the date on which this meeting occurred, the Court cannot be certain whether it is time-barred.[24] But even assuming *arguendo* that it was timely filed, as set forth below, this single factual allegation cannot establish a hostile work environment based on racial discrimination.

As discussed previously with respect to Plaintiff's sexual harassment and sex-based discrimination claim, a hostile work environment that violates Title VII occurs "[w]hen the workplace is permeated with 'discriminatory intimidation, ridicule, and insult' that is 'sufficiently severe or pervasive to alter the conditions of the victim's employment and create an

---

[24] As discussed above, because Plaintiff initiated contact with an EEO counselor on May 2, 2014, any event occurring prior to March 18, 2014, falls outside the 45-day statutory filing window.

abusive working environment.'" *Harris*, 510 U.S. at 21 (1993) (quoting *Meritor Sav. Bank, FSB*, 477 U.S. at 65, 67). Even if a plaintiff alleges a stressful or harsh work environment, not every such workplace is "discriminatorily abusive" such that it is actionable under Title VII. *Harris*, 510 U.S. at 22; *see also Tucker v. Johnson*, 211 F. Supp. 3d 95, 101 (D.D.C. 2016) (discussing Title VII's "demanding legal standard" (quoting *Bergbauer v. Mabus*, 934 F. Supp. 2d 55, 77 n.20 (D.D.C. 2013))). A court evaluating the incidents presented as part of a hostile work environment claim is to analyze the totality of the circumstances and "consider the frequency of the harassing conduct, its severity, whether it is physically threatening or humiliating, and whether it unreasonably interferes with an employee's work performance." *Stewart v. Evans*, 275 F.3d 1126, 1134–35 (D.C. Cir. 2002) (citing *Harris*, 510 U.S. at 21–23; *see also Baloch v. Kempthorne*, 550 F.3d 1191, 1201 (D.C. Cir. 2008). Although there is no firm rule concerning the minimum number of incidents required, and although a court is to consider "whether the alleged conduct is 'sufficiently severe *or* pervasive'—written in the disjunctive," it is rare for a single incident to create a hostile work environment. *Ayissi-Etoh v. Fannie Mae*, 712 F.3d 572, 579 (D.C. Cir. 2013) (Kavanaugh, J., concurring) (citing *Faragher*, 524 U.S. at 788; *Stewart*, 275 F.3d at 1134; *Freedman v. MCI Telecomms. Corp.*, 255 F.3d 840, 848–49 (D.C. Cir. 2001)).

Here, the evidence presented concerning the shop floor meeting does not establish that this incident was so severe that it alone can sustain Plaintiff's claim of a hostile work environment based on race. The evidence concerning this meeting does not point to any physical abuse or threat of the sort that courts have found actionable. *See id.* at 580 ("Courts and commentators alike agree that a single *physical* act—such as a physical assault—can create a hostile work environment." (citing cases)). Nor is this the sort of "single *verbal* (or visual)

incident" that has been found "sufficiently severe to justify a finding of a hostile work environment." *Id*. For example, *Ayissi-Etoh* involved the alleged use of a "deeply offensive racial epithet" when yelling at an employee, which the Circuit suggested "might well have been sufficient to establish a hostile work environment." *Id*. at 295. Courts in other circuits have, moreover, found that a single act such as racially-charged graffiti that "can be described as nothing less than a death threat" aimed directly at the plaintiff, *Reedy v. Quebecor Printing Eagle, Inc*., 333 F.3d 906, 909 (8th Cir. 2003), was so severe as to permit the plaintiff to make out a hostile work environment claim.

Even taking all factual allegations as true and construing all ambiguities in favor of Ms. Newell, the shop floor meeting does not reach a similarly actionable level of severity. There is no evidence that Mr. Smith employed denigrating racial epithets or other racially charged language. Nor is there any evidence that he threatened minority employees in any way. Although the sort of segregated meeting that Plaintiff alleges could send a powerful message of exclusion, that expressive signal alone does not rise to the level of severity that, standing alone, can support a race-based hostile work environment claim. Thus, because she has not provided any other support for a claim of hostile work environment based on race, Plaintiff fails to offer evidence that would permit a reasonable juror to find a genuine issue of material fact on this aspect of her complaint.[25]

---

[25] This conclusion would not change even if the Court added the confrontations with white male employees that do not involve sexual harassment (e.g., being yelled at and called an idiot) to this analysis. As the Court addressed previously in parsing Plaintiff's sex discrimination claim, these sorts of sporadic verbal altercations are not actionably severe on their own. *See Ayissi-Etoh*, 712 F.3d at 579 (Kavanaugh, J., concurring). Nor does a total of four incidents in four months create a pervasively abusive work environment based on race discrimination, especially where, as here, Plaintiff does not point to any other evidence of humiliating or threatening conduct allegedly based on her race.

## C. 2017 Retaliation and Discrimination Claims

In addition to the claims arising from her 2014 EEO complaint, Ms. Newell also seeks relief based on claims that she administratively filed in 2017. The Court now turns to Defendant's motion for summary judgment on these claims.

### 1. 2017 Non-Selection Claim

Ms. Newell contacted an EEO counselor on August 25, 2017, alleging that "BEP had discriminated against her based on her race and age and retaliated against for prior EEO activity when she was denied the position of Plate Printer Assistant Supervisor in November 2015." Pl.'s SMF 39–40. Ms. Newell filed a formal complaint for this claim on December 4, 2017. *Id.* at 39. Defendant argues that this claim is "time-barred because Plaintiff failed to initiate contact with an EEO counselor within 45 days of learning of her non-selection for the permanent Assistant Supervisor position (October 2015)[] [or] the denial of her request to take a training class (February 2017)." Def.'s Mem. 15. Plaintiff retorts that her claims are not time-barred because she "only became aware that her 2015 non-selection [] was discriminatory[] in August 2017," Pl.'s Opp'n 32–33, such that she timely filed this complaint. Ms. Newell asserts that, between notification of her non-selection in October 2015 and her EEO contact in 2017, she had been operating under the belief that the four individuals selected for the 2015 vacancy were serving as "acting Plate Printer Assistant Supervisors," and not as permanent supervisors chosen to fill the job announcement. Pl.'s Opp'n Ex. 93-B, EEO Counselor's Report 4, ECF No. 19-95; *see also* Pl.'s Opp'n 32–33 (quoting EEO Counselor's Report). Thus, according to Plaintiff, she contacted the EEO counselor as soon as she realized that these individuals had in fact been selected for the permanent position, and the Court should waive or toll the forty-five-day

requirement for her non-selection claim.  *Id*. at 32.  For the reasons set forth below, Defendant has the better argument.

Again, federal regulations establish strict timing requirements that apply to Title VII claims.  A federal government employee who "believe[s] they have been discriminated against on the basis of" race or gender must contact an EEO Counselor within forty-five days of a personnel action alleged to be discriminatory.  29 C.F.R. § 1614.105(a).  For a non-selection case, the relevant personnel action occurs on the "date[] when other candidates are officially promoted."  *Vasser v. McDonald*, 228 F. Supp. 3d 1, 13 (D.D.C. 2016) (citing *Jakubiak v. Perry*, 101 F.3d 23, 26–27 (4th Cir. 1996)).

Notwithstanding these regulatory requirements, "[i]n the context of non-[selection], courts are open to tolling administrative deadlines until the time when the complainant had reason to know that she was not selected for a promotion."  *Sierra I*, 254 F. Supp. 3d at 241 (citing *Hairston v. Tapella*, 664 F. Supp. 2d 106, 114 (D.D.C. 2009)).  This is not a remedy to be granted lightly: equitable tolling "is granted only in 'extraordinary and carefully circumscribed circumstances."  *Harris v. Gonzales*, 488 F.3d 442, 444 (D.C. Cir. 2007) (quoting *Smith–Haynie v. District of Columbia,* 155 F.3d 575, 580 (D.C. Cir. 1998)); *see also Sierra I*, 254 F. Supp. 3d at 239 ("[T]imely administrative filing is, with rare exception, a prerequisite to filing suit.") (citing *Achagzai v. Broad. Bd. of Governors*, 170 F. Supp. 3d 164, 180 (D.D.C. 2016); *Horsey v. United States Dep't of State*, 170 F. Supp. 3d 256, 267 (D.D.C. 2016); *Laughlin v. Holder*, 923 F. Supp. 2d 204, 211 (D.D.C. 2013)) (citation omitted); *Mondy v. Sec'y of the Army,* 845 F.2d 1051, 1057 (D.C. Cir. 1988).  The petitioner bears the burden of showing that circumstances exist to warrant tolling.  *Harris*, 488 F.3d at 444 (citing *Harris v. Attorney Gen. of the United States*, 400 F. Supp. 2d 24, 26 (D.D.C. 2005)).

Here, because it is undisputed that Plaintiff was notified of her non-selection for the permanent position in October 2015, that the four candidates were promoted on November 1, 2015, and that Plaintiff contacted an EEO counselor regarding this non-selection for the first time in August 2017, Pl.'s SMF 31–33, this claim is time-barred unless Ms. Newell can carry her burden to establish that equitable tolling is warranted.[26] *Harris*, 488 F.3d at 444 (stating that the party who seeks equitable tolling has the burden to "prov[e] reasons that would support . . . tolling of the 45-day time limit.'" (quoting *Harris*, 400 F. Supp. at 26); *see Vasser*, 228 F. Supp. 3d at 12 (quoting *Harris*, 488 F.3d at 444). But Ms. Newell cannot satisfy her burden to show that she neither knew nor should have known about the alleged discrimination and retaliation until August 2017. Plaintiff contends that she did not have reason to know because she erroneously believed that the four selected individuals were operating in an "acting," not permanent, capacity until this time. Pl.'s Opp'n 32–33. Ms. Newell maintains that she is therefore entitled to equitable tolling because she "notif[ied] an EEO counselor within 45 days of 'apprehend[ing] that an adverse employment decision was motivated by a discriminatory purpose.'" *Vasser*, 228 F. Supp. 3d at 13 (quoting *Pacheco v. Rice*, 966 F.2d 904, 906 (5th Cir. 1992)); *see also Miller v. Hersman*, 594 F.3d 8, 12 (D.C. Cir. 2010) (favorably citing *Pacheco*'s construal of the forty-five-day rule). But that is not the controlling standard. The law does not ask when she *in fact* apprehended the alleged discrimination. The test is, rather, when she should have had a *reasonable suspicion* of discriminatory and retaliatory non-selection. *Armmstrong v. Jackson*, No. CIVA 05-0075 JDB, 2006 WL 2024975, at *4 (D.D.C. July 17, 2006) ("[T]his

---

[26] Again, Plaintiff asks, without providing more argumentation or specificity concerning the nature of any waiver, for the Court to waive or toll the timing requirement. Because Defendant timely raised the affirmative defense of administrative non-exhaustion in its answer, there is nothing in the record before the Court that suggests that it waived this argument. The Court thus considers only equitable tolling here.

Circuit employs a reasonable suspicion standard when determining whether to toll the limitations period." (citing 29 C.F.R. § 1614.105(a)(2); *Stewart v. Ashcroft*, 352 F.3d 422, 425 (D.C. Cir. 2003)).

Plaintiff should have had such a reasonable suspicion at the time of her non-selection and the promotion of the four other candidates. At no point does Ms. Newell dispute that the four selectees were promoted on November 1, 2015, Pl.'s SMF 32, or that she learned of her own non-selection for the position any later than October 2015, *id*. at 33. At this time, Ms. Newell had already filed an EEO complaint alleging that she was "subjected to disparate treatment . . . when on March 31, 2014, she was not made a permanent Plate Printer Assistant Supervisor and was told to return to her Plate Printer Position." Amended EEO Acceptance Letter, Bates No. 00074. Even if she did not realize that the positions were permanent in October 2015, these uncontroverted facts both illustrate her awareness that others had filled the vacancies as of November 1, 2015, and indicate that, on that date, she suspected or should have suspected prior improper conduct by her supervisors. Under these conditions, she possessed at least constructive awareness of discriminatory or retaliatory conduct at the time of the non-selection in October 2015. Accordingly, at this time, Ms. Newell had enough information in her possession to trigger a "reasonable suspicion" of discrimination. *Armmstrong*, 2006 WL 2024975, at *4. Because Plaintiff provides no reason to believe that, exercising "all due diligence," she was unable to obtain "essential" information to pursue her claim at this time, she has not carried her burden to invoke equitable tolling for this claim. Thus, the 2017 non-selection claim is time-barred.

### 2. Other Allegations of Discrimination and Retaliation

Plaintiff's complaint before this Court raises two further allegations of, first, discriminatory and, second, retaliatory denial of a training opportunity in 2017 and denial of a

bonus that were not included in the 2017 administrative complaint accepted by the agency. Pl.'s Opp'n 40; *see also* Compl. ¶¶ 22–23 ("Other retaliatory acts included denial of the opportunity to take leadership classes that would have helped Newell position herself for a promotion. Newell was also denied a bonus and was given numerous false reasons for the denial."). Defendant argues that the denial of a training opportunity claim, like Ms. Newell's 2017 non-selection claim, is time-barred because it occurred "on or about February 16, 2017," which is more than forty-five days before Plaintiff administratively pursued this claim in August 2017. Def.'s Mem. 18. Defendant further asserts that the Court should grant summary judgment on Ms. Newell's claim for denial of a bonus on an unspecified date "because Plaintiff offers no evidence that it was the result of discrimination or retaliation." *Id*. at 18 n.7. Ms. Newell does not address the argument that the 2017 denial of training is time-barred at all. Instead, Plaintiff argues broadly that she has pointed to material facts in dispute; accordingly, she asserts that BEP has not carried its burden in moving for summary judgment. Pl.'s Opp'n 33. In support of this contention, Plaintiff references her statement of material facts, which asserts that Ms. Newell was denied an "on the spot award" despite the inclusion of her name for this bonus and the fact that all the other members of her team received this bonus. Pl.'s SMF 34. Plaintiff also alleges therein that she was denied a training opportunity on pretextual scheduling grounds, whereas "[a] white[] male with no known EEO activity also had the same amount of [scheduling] coverage but was approved for the training." *Id*. at 35. For the reasons set forth below, Plaintiff's arguments are unavailing.

### a. Denial of Bonus Claim

In association with the non-selection claim, Ms. Newell alleges that BEP retaliated and discriminated against her by denying her a bonus.[27]  Compl. 1, ¶ 23; Pl.'s Opp'n 24.  Because Defendant cannot "pin down the precise date in 2017" on which the contested "on the spot" bonus was awarded, it does not allege that Plaintiff failed to administratively exhaust this claim.  Def.'s Mem. 18 n.7.  Defendant instead argues that the Court should grant summary judgment because Ms. Newell has not presented evidence to establish that the denial of any bonus "was the result of discrimination or retaliation."  *Id.*  The Court will first consider Ms. Newell's retaliation claim before turning to her discrimination claim.  For the following reasons, Defendant has the better argument on both fronts.

The anti-retaliation provision of Title VII "forbids an employer from 'discriminat[ing] against' an employee or job applicant because that individual 'opposed any practice' made unlawful by Title VII or 'made a charge, testified, assisted, or participated in' a Title VII proceeding or investigation."  *Burlington N. & Santa Fe Ry. Co.*, 548 U.S. at 56 (quoting § 2000e–3(a)).  Where, as here, there is only indirect evidence of intentional discrimination, the claimant may rely on the previously-described *McDonnell Douglas* three-step method of proof.  *See Hernandez v. Pritzker*, 741 F.3d 129, 133 (D.C. Cir. 2013).  Again, under this framework, once "the employer has proffered a legitimate, non-retaliatory reason for a challenged employment action," the "central question" for the court to address is "whether the employee produced sufficient evidence for a reasonable jury to find that the employer's asserted non-

---

[27] Plaintiff's complaint refers to this denial as retaliatory.  Compl. ¶ 23.  Elsewhere, Plaintiff characterizes this allegation as both discriminatory and retaliatory.  Pl.'s Opp'n 24 ("Ms. Newell also offers the discriminatory denial of a bonus as further evidence of the retaliatory and discriminatory environment that she was subjected to.").  The Court thus reads Plaintiff's allegation as one of both retaliation and discrimination.

retaliatory reason was not the actual reason and that the employer intentionally retaliated against the employee in violation of Title VII." *Id.* (quoting *McGrath v. Clinton*, 666 F.3d 1377, 1383 (D.C. Cir. 2012)).

Here, Defendant asserts a legitimate, non-retaliatory reason for the alleged denial of a bonus. Relying on a declaration by Mr. Smith, Defendant states that night shift employee did not receive the bonus and Ms. Newell was not within the class of daytime employees who received a bonus that year. *See* Third Smith Decl. ¶ 28. More specifically, Defendant describes the contested bonus as an "on the spot" award that management grants at its discretion to recognize "employees that perform their duties above and beyond their normal requirements." Pl.'s SMF 34. On the year in question, 2017, Defendant states that the "on the spot" award went to employees on the daytime work shift who had completed a testing project in Section Six. Third Smith Decl. ¶ 28. Because Ms. Newell was assigned to the evening work shift at this time, neither Ms. Newell nor any other employees on the evening shift received this bonus. *Id.* Because this relatively specific, substantiated explanation is sufficient to permit a reasonable juror who credits it to believe Defendant's non-discriminatory rationale, Defendant has carried its burden of production at the second step of the *McDonnell Douglas* framework.

The burden thus shifts back to Plaintiff, who must produce "sufficient evidence for a reasonable jury to find that . . . [BEP's] asserted non-retaliatory reason was not the actual reason" for its denial of a bonus. *McGrath,* 666 F.3d at 1383 (internal alterations and quotation marks omitted). In support of her claim, Ms. Newell relies on her own account of the denial. She presents her own sworn statement that "everyone on her team" received it, Pl.'s Resp. Def.'s First Set of Interrogatories 7, coupled with references to the denial of a bonus in her initial contact with an EEO counselor, *see* BEP Office of Equal Opportunity and Diversity

Management Initial Contact Sheet 5. In addition, although she does not elaborate on the grievance procedure, Ms. Newell states that she ultimately received this bonus "[a]fter numerous complaints and informing the Agency attorneys in the EEO matter." Compl. ¶ 23; *see also* Pl.'s Opp'n 24 ("[B]efore Ms. Newell was able to receive the bonus, she was required to grieve [sic] it." (citing Pl.'s Resp. Def.'s First Set of Interrogatories 7)). At no point does Ms. Newell provide any further detail regarding the reasons that she was ultimately given the bonus or any further evidence in support of her claim that the initial denial was retaliatory.[28] Without more, no reasonable trier of fact could find that Defendant's stated, nonretaliatory reason was pretext for retaliation. The same is true about Ms. Newell's allegation that denial of the bonus was discriminatory (as opposed to retaliatory). Without any evidentiary support to sustain her allegation, which Plaintiff does not provide, there is nothing with which to rebut Defendant's nondiscriminatory explanation about night versus day-shift employees. Thus, Plaintiff has not carried her burden of proof for either her discriminatory and retaliatory denial of bonus claim.

Moreover, as Defendant notes in an extremely cursory fashion, this aspect of Plaintiff's claim is moot because Ms. Newell admits that she eventually received the contested bonus. Def.'s Mem. 34 n.11 (citing Pl.'s Resp. Def.'s First Set of Interrogatories 7); *see also* Def.'s Reply 35 (citing Pl.'s Opp. 24). Where, as here, an allegedly adverse employment action in the form of denial of a bonus is corrected before a plaintiff files suit, this Circuit has held that "there was no unremedied adverse employment action when the suit was filed," and summary judgment is appropriate. *Taylor*, 350 F.3d at 1294. Thus, because Ms. Newell admits that she received the

---

[28] Plaintiff's initial complaint mentions "numerous false reasons for the denial," including shifting explanations, Compl. ¶ 23, but there is no admissible evidence in the record in which Ms. Newell develops these factual allegations. Without further development in her opposition or any evidentiary support, these conclusory allegations fail to substantiate her claim. *Greene*, 164 F.3d at 675.

bonus, there remains no unremedied adverse employment action to contest before the Court, and summary judgment on this claim is appropriate on these separate grounds.

### b. Denial of Training Claim

Finally, Ms. Newell claims that she was discriminated and retaliated against when her supervisor, Mr. Smith, denied her a training opportunity that a "White male counterpart" was allowed to pursue.[29]  Compl. ¶ 22.  But Ms. Newell did not timely file this claim.  As the Court previously explained, she was required to contact an EEO counselor within forty-five-days of the alleged discriminatory or retaliatory event.  Here, assuming *arguendo* that the alleged denial of a training opportunity is "'reasonably related to the allegations'" that Ms. Newell administratively filed in August 2017 and "growing out of such allegations,'" *Haynes*, 924 F.3d at 526 (citing, then quoting, *Park*, 71 F.3d at 907), this claim is time-barred because Plaintiff did not initiate EEO contact within forty-five days of its occurrence.  Moreover, on the Court's best read of her arguments for tolling or waiver, *see* Pl.'s Opp'n 31–32, Plaintiff does not seek equitable tolling concerning this aspect of her claim.  Thus, Ms. Newell cannot pursue relief for this allegation for the first time before this Court.

---

[29] As with her claim regarding non-payment of a bonus, Plaintiff initially refers to this denial of a training opportunity as retaliatory.  Compl. ¶ 22; *see also* Pl.'s Opp'n 21 (noting that individual allowed to take class had "no known EEO activity").  Elsewhere, she appears to allege that this denial was discriminatory.  Pl.'s Opp'n 6 ("Ms. Newell timely contacted the EEO office . . . after she learned that she was discriminated against on August 2017 for the aforementioned non-selections . . . as well as her denial of training.").  The Court takes these filings to allege both retaliation and discrimination.

## V.  CONCLUSION

For the foregoing reasons, Defendant's motion for summary judgment is **GRANTED**.

An order consistent with this Memorandum Opinion is separately and contemporaneously issued.


Dated:  January 13, 2020                                    RUDOLPH CONTRERAS
                                                            United States District Judge